THE STATE v. FRANK BARRETT, Appellant.

Division Two, February 27, 1912.

1. **EVIDENCE: Impeachment of Defendant.** It is not error to admit, in rebuttal, after defendant has testified as a witness, testimony of his bad moral character, although it relates to his habit of excessive drinking, and he is on trial for murder.

2. ————: **Deceased's Former Acts of Violence.** Testimony of prior particular acts of violence committed by deceased against others than defendant, of which defendant had no knowledge of any other kind at the time of the homicide, is properly excluded.

240 Sup.—11

3. ————: **Deceased's Desperate Character: Opinion of Repu-**
**tation.**  There being ample evidence that deceased was gen-
erally reputed to be a violent, desperate and dangerous man,
mere opinion testimony of his reputation in this respect, such
as the opinion that he had been "the most dangerous man in
the county," should be excluded. The fact of bad reputation is
the thing to be established. Its comparison with an uncertain
and undefined standard cannot aid the jury or benefit defendant.

4. **MANSLAUGHTER: Instruction: No Violence or Personal As-**
**sault.**  Although there is evidence tending to prove that de-
ceased was advancing upon defendant, with a stick or club in
his hand, and in a threatening manner, at the time defendant
fired the shots, yet if there is none tending to show an assault
by the deceased amounting to personal violence, there is no
room in the case for an instruction on manslaughter in the
fourth degree. To have the effect of reducing the grade of the
homicide from murder to manslaughter, the provocation must
consist of personal violence.

5. **REPUTATION: Knowledge: Apprehension: As Explaining De-**
**ceased's Conduct During Difficulty.**  The court should instruct
the jury that the bad reputation of deceased, if known to de-
fendant, should be considered by the jury in their consideration
of defendant's reasonable cause for apprehension of great per-
sonal injury. But it is not error to refuse to instruct them
that they may consider his bad reputation, whether known to
defendant or not, for the purpose of explaining the conduct of
the deceased during the difficulty. So that the court did not
err in refusing an instruction asked by defendant directing
them to consider the deceased's bad character, though unknown
to defendant, "for the purpose of throwing light on the conduct
and demeanor of deceased during the difficulty, and also for the
purpose of throwing light on defendant's apprehensions, if any,
at the time of the shooting." [Holding that this ruling is not
in conflict with the prior cases of State v. Kennade, 121 Mo. l. c.
415, and State v. Hicks, 27 Mo. l. c. 590.]

Appeal from Pemiscot Circuit Court.—*Hon. H. C.*
*Riley,* Judge.

AFFIRMED.

*C. P. Hawkins* for appellant.

(1)  The information does not charge that it was
preferred against the defendant by the prosecuting at-
torney of Pemiscot county, but appears to have been

filed by one acting for the entire State. R. S. 1909, sec. 5115. (2) If the defendant should have been convicted at all, it should not have been for more than manslaughter in the fourth degree, and the punishment being two years, the punishment was excessive. R. S. 1909, sec. 4551. (3) The trial court should have instructed for manslaughter in the fourth degree. (4) The court, over the objection of the defendant at the time, allowed the prosecuting attorney to ask the defendant if he had not killed a man in some other State before coming to Missouri, which had a tendency to prejudice the jury against the defendant. (5) The court permitted the prosecuting attorney to attack and call in question the reputation of the defendant when the same had not been put in issue by the defendant, and further allowed the State to prove the defendant was a drinking man. (6) The court should not have allowed the State to prove alleged specific acts of the witness Hill for the purpose of attempting to impeach him. (7) The defendant undertook to prove that the deceased had beat the wash woman, cut old man Lett's throat, and when drinking was regarded as the most desperate and dangerous man in Pemiscot county. This, the trial court refused. The jury should have known how desperate he was when drinking, as it was this man the defendant had to meet. (8) Self-defense was established beyond all question and if he should not have been acquitted then he should only have been convicted for manslaughter in the fourth degree and the punishment was and is excessive. R. S. 1909, secs. 4467, 4469 and 4551; State v. Bowls, 146 Mo. 6.

*Elliott W. Major,* Attorney-General, and *Campbell Cummings,* Assistant Attorney-General, for the State.

(1) The information is sufficient in every respect and a substantial compliance with the statutes, being signed by the prosecuting attorney and verified by his

oath. It is of no consequence that he used his initials in his name or in his signature. Sec. 5057, R. S. 1909; State v. Kelley, 191 Mo. 680; State v. Brock, 186 Mo. 457; State v. Kyle, 166 Mo. 287; State v. Campbell, 210 Mo. 215; State v. Walker, 129 Mo. App. 376. It was not error to permit the State to prove defendant's general reputation for morality in the community where he lived to be bad, as all such was introduced after defendant had testified. The remaining objections either came too late after witness had answered or were perfectly harmless and without merit. When witness had answered before objection, a motion to strike out should have been made. State v. Lovell, 235 Mo. 343; State v. Bateman, 198 Mo. 212. (3) The inquiry as to the character of deceased must relate solely to his general character for violence, ferocity, vindictiveness or blood-thirstiness. 21 Cyc. 910, 956, 960, 971; State v. Elkins, 63 Mo. 159; State v. Jones, 134 Mo. 254; State v. Zorn, 202 Mo. 29; State v. Sykes, 191 Mo. 62; State v. Foley, 144 Mo. 600. (4) Particular assaults of deceased against third parties were wholly incompetent and irrelevant. It was not a proper way to prove that the deceased was a turbulent and dangerous man; and it was not shown even that defendant was present or had any knowledge of them. State v. Green, 229 Mo. 652; State v. Jones, 134 Mo. 262; State v. Nelson, 166 Mo. 205; State v. Elkins, 63 Mo. 165, 21 Cyc. 960. (5) After certain of appellant's witnesses had testified that the deceased's reputation was bad for peace and quiet and for being a turbulent, quarrelsome, dangerous and fighting man they were asked: "As a matter of fact, wasn't deceased the worst and most dangerous man in the county at that time? I will ask you whether or not you didn't consider deceased one of the worst and most dangerous men in your county at that time?" They call clearly for the individual opinion of the witness without any foundation being laid. State v. Elkins,

63 Mo. 165; State v. Niehaus, 217 Mo. 352, 21 Cyc. 961.
Defendant's refused instruction, as to the quarrel-
some, turbulent and dangerous character of the de-
ceased, is not limited by knowledge thereof possessed
by the defendant. If this court finds that there was a
doubt as to who was the aggressor and decides to fol-
low the Feeley case, and the cases therein cited, then
we are inclined to believe that the refusal of appel-
lant's instruction was error—unless the court holds
that appellant, at his own instance, offering the two in-
structions (3 and 5), cannot complain of the error.
State v. Payne, 223 Mo. 112; State v. Linn, 223 Mo.
98; R. S. 1909, sec. 5115.

KENNISH, J.—Convicted in the Pemiscot Circuit
Court of murder in the second degree, defendant ap-
pealed.

The evidence for the State tended to show that,
in company with others, deceased and defendant, on
the day of the killing, had participated in a drinking
bout at the home of one Fronan, a witness for the
State. Deceased and defendant were on friendly
terms when they reached Fronan's, the gun (unloaded)
which defendant had and the knife in Sells's (de-
ceased's) possession being taken for no unlawful pur-
pose, so far as the evidence in this record indicates.

Fronan, aware of deceased's dangerous disposi-
tion, secured the latter's knife in advance of and in
order to prevent trouble, but did not deem it neces-
sary to deprive defendant of his gun. After drinking
considerably and engaging in some boisterous con-
duct at Fronan's, and after defendant had searched
deceased (whether for weapons or whisky the evidence
is not clear), the two left Fronan's and went to the
hotel where their conversation indicated that a quar-
rel had been in progress, and where the evidence of
one witness indicates defendant threatened to kill de-

ceased, but, though armed with his shotgun, made no effort to do so.

Sells, the deceased, left the hotel, and defendant went to his room and soon came out loading his gun. He then went to the front of a lumber company's office and sat down upon the steps. In a short time Sells came into view and walked down to a store some forty feet from where defendant was sitting, looked into the store, turned, retraced his steps, procured an oak club, a piece of stacking stick, about three feet long, one inch thick and two inches broad, and walked rapidly, weapon in hand ("like he was looking for something"), past the store mentioned, along the porch, toward where defendant was sitting. As he approached, the latter jumped off and away from the steps, and deceased leaped toward him "but not quite facing him," and as he reached the ground a few feet from defendant, the latter fired, the charge striking Sells on the right shoulder. This shot was fired at such close range that it set fire to deceased's clothing, and though the injury inflicted was not a fatal one the wounded man dropped his club and ran "between fifteen and twenty-five feet" to a fence, when defendant raised his gun and fired a second time. Sells was looking sidewise toward defendant, but turned just as the shot was fired, so that it struck him in the back of the head and caused his death in a few minutes. It appears from the testimony of the physician who reached Sells in a very short time, that this second shot singed or burned the hair along the neck.

On cross-examination several witnesses for the State testified that deceased had the reputation of being a violent, turbulent and dangerous man.

On the part of the defense, the evidence tended to show that deceased, knife in hand, had been looking for defendant, declaring he intended "to cut his throat if he could find him;" that immediately before he was killed, as he approached the place where defend-

ant was sitting, he told one witness (referring to defendant) that he was "going to kill the son-of-a-bitch before night;" that as he walked straight to where defendant was sitting, the latter arose from the steps and, as Sells, after coming down the steps, advanced upon him with the club raised to strike, drew his gun up and fired twice in rapid succession, Sells wheeling as the first shot was fired.

Threats on the same day by Sells to kill defendant "before he slept a wink," and the like, were in evidence, and witnesses (including officials) for the defense, as well as those for the State, testified to the fact that deceased had the reputation of being a violent, dangerous and desperate man, and the record of his conviction for felonious assault and sentence to the penitentiary was in evidence. There was also evidence that during the afternoon Sells had drawn a knife on defendant, and, with vile epithets, declared he "had it in for him and this is as good time to settle it as we will ever get."

Defendant's version of the matter was that after being threatened by deceased during the afternoon, he concluded to leave the town to avoid trouble and took his shotgun to kill rabbits for bait on his trot line; that he came around the back way to avoid being seen by Sells, and when he reached a point between the store and the office Sells was on the office porch with a knife and a club and immediately declared he was going to "cut his [defendant's] head off," and "beat him up," and started for him; that Sells jumped off the porch, and was coming at him when he fired twice, as quickly as he could, and that he shot because he had to do so to save his own life.

The State offered some evidence that defendant's reputation for morality was bad. Cross-examination developed the fact that this was due practically entirely to his habit of drinking too much.

Numerous exceptions were saved to the rulings of the trial court.

In answer to the objections made to the information, nothing need be said save that previous decisions (State v. Bailey, 190 Mo. l. c. 263; State v. Barnett, 203 Mo. l. c. 645; State v. Hudspeth, 150 Mo. l. c. 19; State v. Turlington, 102 Mo. l. c 647) attest its sufficiency, and no further reply need be made to the complaint of the ruling of the trial court in admitting evidence of defendant's bad moral character, in rebuttal and after he had testified as a witness, than that the ruling was in accord with the settled law of this State. [State v. Beckner, 194 Mo. 281; State v. Priest, 215 Mo. l. c. 7.]

The ruling excluding evidence of prior particular acts of violence committed by deceased against others than defendant, of which defendant had no knowledge of any kind at the time of the homicide, was in accord with the rule long adhered to in this State. [State v. Green, 229 Mo. l. c. 652; State v. Elkins, 63 Mo. l. c. 165.] There was ample evidence that deceased was generally reputed to be of violent, dangerous and desperate character. In fact, there was no contention to the contrary, witnesses for the State and defendant agreeing in this particular.

Nor was it error to exclude mere opinions as to the deceased's reputation in the respect mentioned, and opinions as to whether deceased had not been the "most dangerous man" in the county. The same witnesses testified to the *fact* of bad reputation, and comparisons with an uncertain and undefined standard of this kind could not have aided the jury or benefited the defendant in this case.

Complaint is also made that the court permitted the State to show that defendant was in the habit of drinking, and to show specific acts of wrong-doing for the purpose of impeaching the witness Hill. A careful examination of the record discloses that there is

no foundation therein for this assignment. These matters were brought out by defendant's counsel on the cross-examination of impeaching witnesses, and seem to have been purposely elicited to break the force of the general answers given by such witnesses, by showing that the bad reputation to which they had testified was the outgrowth of matters of no great consequence so far as concerned the trait with respect to which the State was endeavoring to impeach defendant and his witness Hill. There is nothing in this assignment.

Appellant complains that the court erred in failing to instruct the jury on manslaughter in the fourth degree. No exception was saved to the action of the court in failing to so instruct, but one of the grounds of the motion for a new trial was that "the court erred in refusing to fully instruct the jury on all matters of law, as required by law, over the objections and exceptions of the defendant at the time." Under the view we have taken of this assignment it is unnecessary to notice the technical question as to whether the alleged failure to instruct on manslaughter is properly preserved for review in this court.

While there was evidence tending to prove that the deceased was advancing upon the defendant, with a stick or club in his hand, and in a threatening manner, at the time the shots were fired, there was no testimony whatever tending to show an assault by the deceased amounting to personal violence. This court, long ago, in the case of State v. Starr, 38 Mo. l. c. 277, not only announced the law applicable to the facts of this case, but also the reason for the rule there adopted and the unwisdom of "one fluctuating or less rigid," in the following language:

"To have the effect to reduce the guilt of killing to the lower grade, the provocation must consist of personal violence. [Whart., Crim. L. 436; State v. Merril, 2 Dev. 269; Beauchamp v. State, 6 Blackf. 299;

Oneby's Case, 2 Ld. Raym. 1485; 1 Russ. on Cr., 435; Whart. on Hom., 170.] This rule is well established, and we imagine it would not be the part of wisdom to substitute in its place one fluctuating or less rigid, which would require the accused to be judged in each case according to the excitement incident to his natural temperament when aroused by real or fancied insult given by words alone. [Kelley, 135.] There must be an assault upon the person, as where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway (Lannusse's Case, 1 Hale P. C. 455), or other direct and actual battery. [Rex v. Stedman, Foster, 292.]''

The doctrine of that case has been followed in a long line of decisions, with very few exceptions, and it has been reviewed and reaffirmed in the recent cases of State v. Gartrell, 171 Mo. 489, l. c. 517; State v. Gordon, 191 Mo. 114, l. c. 125; State v. Sebastian, 215 Mo. 58, l. c. 80; State v. McKenzie, 228 Mo. 385, l. c. 402 and State v. Sharp, 233 Mo. 269, l. c. 290.

We adhere to the doctrine of the cases cited, and hold that under the evidence appellant was not entitled to an instruction on manslaughter in the fourth degree.

Instruction numbered 5, given by the court of its own motion, was as follows:

"The court instructs the jury that if you believe from the evidence that the deceased was of a rash, turbulent and violent disposition, and that the defendant had knowledge of such disposition, then it is a circumstance for the consideration of the jury in considering the reasonable cause for defendant's apprehension of great personal injury to himself."

And instruction numbered 3, requested by appellant and refused by the court, was as follows:

"The court instructs the jury that you will take into consideration the evidence as to the quarrelsome, turbulent and dangerous character of the deceased,

and give it such credit and weight as you deem it entitled to. You may also consider such evidence for the purpose of throwing light upon the conduct and demeanor of the deceased during the difficulty between him and the defendant, and also for the purpose of throwing light upon the defendant's apprehensions, if any, at the time of the shooting.''

Appellant complains that the court erred in giving the first of the foregoing instructions and in refusing to give the second.

A comparison of the two instructions shows that the court limited the consideration of the reputation of the deceased as a dangerous man to the defendant's right of self-defense, and authorized the jury to consider such testimony for that purpose only in case they found that the defendant had knowledge of such reputation. On the other hand the said instruction asked by the defendant and refused, authorized the jury to consider the bad character of the deceased, though unknown to the defendant, ''for the purpose of throwing light on the conduct and demeanor of the deceased during the difficulty . . . and also for the purpose of throwing light on defendant's apprehensions, if any, at the time of the shooting.'' It is clear that the evidence tending to show the reputation of the deceased as a dangerous man could not have affected defendant's apprehension if unknown to him, and to that extent the court did not err in thus refusing the defendant's instruction. Was the defendant entitled to the instruction directing the jury that they might consider such testimony for the purpose of explaining the conduct of the deceased during the difficulty?

In the case of State v. Kennade, 121 Mo. l. c. 415, discussing this question, the court said: ''Even if deceased had a reputation for being quarrelsome and dangerous, evidence of it could not have been received unless it had been previously shown that defendant

*knew it,* and therefore might more reasonably apprehend danger in certain circumstances, than if that reputation had been different. As this knowledge of defendant of the reputation of the deceased is affirmatively shown by his own testimony not to have existed, an answer to the question asked the officers was correctly denied.''

And in the case of State v. Hicks, 27 Mo. l. c. 590: ''But the imminence of danger that will justify us in acting upon the instinct of our nature in repelling a blow before it is received, often depends on the character of the assailant. The menacing attitude of a person generally peaceable and law-abiding would often excite no just apprehension of danger, whilst similar conduct of a fierce, vindictive and passionate man would naturally alarm our fears and make us prompt in anticipating his purposes. When danger is threatened and impending we are not compelled to stand with our arms folded until it is too late to strike, but the law permits us to act on reasonable fear; and therefore when the killing has been under circumstances that create a doubt as to whether the act was committed in malice or from a sense of real danger, the jury have a right to consider any testimony that will explain the motive that prompted the accused.''

. In the Hicks case, as shown by the excerpt quoted, it was held that testimony tending to prove that the deceased was a dangerous man was admissible only where there was doubt as to whether the killing was from malice or from a sense of real danger, that is, whether the homicide was murder or justifiable on the ground of self-defense. The willful killing of a human being is presumptively murder and therefore in such case malice may be presumed, and there may be evidence tending to prove malice. To negative malice the character of the assailant as a dangerous man, if known, is held admissible because it tends to prove that the killing was from a sense of danger, but as a

sense of danger by reason of deceased's character could not exist unless the defendant had knowledge thereof it necessarily follows that in the absence of such knowledge such evidence can have no bearing upon the issue whether the killing was from malice or from a sense of danger.

But it is said that the doctrine of the foregoing cases is overruled by the case of State v. Feeley, 194 Mo. 300. The latter case is also reported in 3 L. R. A. (N. S.) 351, and extensively annotated on the point now before us. A consideration of the many cases there reviewed has convinced us that the current of authority is in accord with the doctrine of the Hicks and Kennade cases and as adopted by the trial court in this case.

In 2 Bishop's New Criminal Procedure (4 Ed.), sec. 611, the reason upon which the rule is based is stated in the following language: "What was unknown to the defendant cannot thus be shown; because it is impossible he should have acted upon it. We have seen that one may rely upon what he did not know when its effect is to prove the absence of any wrong or injury; because then the criminal act did not concur with the criminal intent, both of which are essential in crime. But here, where the act, namely, the homicide, has been committed, and the further inquiry relates simply to the mental condition prompting it, only what the doer knew is relevant; for that alone could have influenced his mind, or in any way contributed to the doing." In Wharton on Homicide (3 Ed.), sec. 263, the law is stated as follows: "The character of the deceased as a violent and dangerous man, offered in evidence for the purpose of showing that the accused had reason to believe himself to be in danger, is not material unless knowledge of such character upon the part of the accused is shown. Though a person has a reputation for being quarrelsome, evidence to that effect cannot be received in a prosecution

against another for killing him, unless it was previously shown that the accused knew it, and therefore might more reasonably apprehend danger from him.'' And in 21 Cyc. 957, it is said: ''It is generally considered to be necessary in order to admit evidence of the dangerous and violent character of deceased that this should appear to have been known to defendant, as otherwise it could not have influenced him,'' etc.

The Feeley case holds that the Kennade case is in conflict with certain decisions of this court therein cited, to-wit: State v. Hicks, 27 Mo. 588; State v. Keene, 50 Mo. 357; State v. Bryant, 55 Mo. 75; State v. Elkins, 63 Mo. 159; and State v. Downs, 91 Mo. 19; and therefore that it should no longer be followed. Because of the importance of this question in criminal procedure we have carefully re-examined the original record in that case now on file in the office of the clerk of this court, and we have failed to find such conflict. On the contrary we think the Kennade case is in accord with the doctrine of the former cases and also with the theory upon which the Feeley case was tried and affirmed in this court.

The question discussed in the Feeley case, as stated, is as follows: ''It is said for defendant that the court erred in permitting the State to show the general reputation of deceased when *not* drinking, when the defendant had only introduced evidence tending to show that deceased was a quarrelsome and dangerous man *when* drinking. The argument is that such evidence upon the part of the State was improper, not rebuttal, and brought forward an issue not raised by the defendant.'' After a review of the authorities on the subject the following conclusion is arrived at, namely, l. c. 320: ''In the case at bar, defendant testified that he shot deceased because he was afraid deceased was going to kill him, and under such circumstances evidence of the character of the deceased for

being quarrelsome and dangerous when *drinking* was properly admitted.''

No objection was made in that case, either on the trial or in this court, to the competency of the evidence tending to show the reputation of the deceased for being quarrelsome when drinking. That testimony was introduced without objection, and it is clear that an objection thereto, if made at all, would have been made by the State and not by the defendant. The question presented on appeal was as to the right of the State to rebut the evidence of the defendant upon the issue of quarrelsomeness by introducing evidence showing that the general reputation of the deceased for peace, quiet and good citizenship was good when not drinking and generally. This court sustained the trial court in admitting such rebuttal testimony. The court gave the following instruction upon that issue which, it will be observed, is almost identical with the instruction given in the case at bar, to-wit: ''If the jury believe from the evidence that the deceased was of a rash, turbulent, quarrelsome and dangerous disposition when drinking and under the influence of liquor, and that at the time of the difficulty the deceased had been drinking and was to any extent under the influence of liquor, or appeared to be so, and that defendant had knowledge of such disposition at the time of the alleged killing, then it is a circumstance for the consideration of the jury in considering the reasonable cause for defendant's apprehension of great personal injury to himself.''

It is argued that as uncommunicated threats were admissible to explain the conduct and demeanor of the deceased at the time of the homicide, and to show who was the aggressor, by analogy testimony showing that deceased was a dangerous man should be admitted for the same purpose; but there is plainly such close connection between a threat to kill and an attempt to do the act threatened, and such a lack of it between evi-

dence of the bad character of the deceased unknown to the defendant, and the homicide, that the competency of the former cannot be considered as affording a reason for the competency of the latter. If the defendant knew he was dealing with a dangerous man his apprehension and right to act should be gauged according to such knowledge and the surrounding facts and circumstances. But if he did not know whether the deceased was a dangerous or peaceable man his right to act from apprehension of danger and in self-defense could not have been affected by the reputation of his assailant.

We are aware that the decisions are not in accord upon this subject, and that there are certain exceptions to the general rule not presented by the facts of this record, but we think the great weight of authority sustains the theory upon which the trial court instructed the jury in this case, and we hold that the court properly refused defendant's instruction numbered 3.

There were circumstances in evidence warranting the inference that the loading of the gun by the defendant, after his first altercation with the deceased, and then taking a position in a public place where he had reason to expect a renewal of the quarrel, was deliberately planned for the purpose of inviting the difficulty, and that the homicide was committed in accordance with such purpose. However, the State elected to try the defendant for murder in the second degree and as the record fails to disclose error prejudicial to the defendant the judgment is affirmed. *Ferriss, P. J.,* concurs, *Brown, J.,* concurs in the result.