THE STATE v. AMOS CARROLL, Appellant.—62 S. W. (2d) 863.

Division Two, August 12, 1933.

*Roy McKittrick*, Attorney-General, and *James L. HornBostel*, Assistant Attorney-General, for respondent.

ELLISON, P. J.—The defendant was indicted for murder in the city of St. Louis, the charge being that he shot with a pistol and killed Roy Clark. On a trial the jury found him guilty of murder in the first degree and fixed the punishment at death. He has appealed as a poor person, filing no brief in this court. It appears from the record all the parties figuring in the homicidal event were negroes. There are two motions for a new trial, one filed within four days after the verdict by the attorneys who represented the defendant in his trial; and another filed seven days after the verdict by a new attorney. The assignments in these will be taken up in the course of the opinion.

The evidence for the State was that about seven-thirty o'clock in the evening of May 12, 1930, the defendant went to the home of his cousin, Ida Griffin and sought to borrow her "gun" until nine o'clock. It was a pistol which she and her husband had had for fourteen years. She customarily kept it under her pillow and it was there that morning when she made the bed. The defendant often called on her. She asked him what was the matter. He inquired if she had any coffee—the defendant was a great coffee drinker. She, the witness, said she would go to the kitchen and see. When she returned the defendant was gone and so was the pistol. The pillow had been turned back. When she had left the room it was "straight." Later that evening some policemen brought the pistol to her and asked her if it was hers. She identified it then as she did at the trial. She could recognize it by the handle and a little dark place on the top part.

Jesse Condrey testified that between seven and seven-thirty in the evening on the date of the homicide, May 12, he and his wife were sitting on the front steps of the house at 1022-A North Nineteenth Street in St. Louis, where they had their home upstairs. It was about dusk. A man came out of the alley, crossed the street, and walked up the front steps at No. 1020 where the deceased Clark lived, which was twelve or fifteen feet away from where the witness was sitting. The man had a revolver up his shirt sleeve, with the barrel projecting down into his left hand and a short string "pulled out that way." He knocked at the door and it was opened by someone. In about half a minute he fired three shots while he was standing on the threshold or just inside, so the flashes of fire could not be seen by the witness. In crossing the street the man had walked a little obliquely but still was facing the witness, with left arm toward him, and Condrey identified the defendant as being the man whose movements he had described, though he had never seen him before

the homicide. The defendant came back out the door right after the shooting as the smoke from the pistol was floating out.

In a few minutes a crowd congregated and the police arrived. They took Condrey, the witness, into the Clark home where the deceased was lying on his back with his feet close to the door. Thence, the witness testified, he was taken to the police station where he made a statement substantially the same as the testimony he gave at the trial.

Mozella Condrey, wife of the previous witness, Jesse Condrey, described the shooting substantially as her husband had done, except she did not see the defendant come out the door thereafter. She thought he might have left by the back way. When the shooting occurred she began "hollering." She identified the defendant as the killer. On cross-examination she said the defendant was standing on the steps when he shot, and that she saw the flashes of fire; also she thought the defendant had the handle of the pistol, not the barrel, down in his hand.

Landa Merritt was the common-law wife or housekeeper of the deceased Roy Clark. She had been living with him about two weeks. At the time of the shooting she was in the kitchen. She heard the shots but didn't see who fired them.

Dee Rankin was in the room with Clark. Someone knocked and Clark opened the door. The defendant stepped in the doorway and said "Roy, you ain't going to pay me," or, as the witness put it a little later the defendant asked "whether he was going to pay him." Clark answered, "Yes, what is the matter, come on in the house." The defendant responded "No, you ain't going to pay me," and commenced shooting. The witness did not see the pistol until the shooting began. He saw Clark fall, from where he stood holding to the door, to a position with his feet toward the door. These questions and answers then appear in the transcript:

"Q. Can you tell the jury whether or not he had any weapons in his hands? A. Whether he had anything or not, I don't know, I didn't see anything.

"Q. Did you see his hands? A. Sir?

"Q. Did you see Roy Clark's hands? A. Yes sir, I saw him when, that time on the dresser, he didn't have nothing that I know of, what he did I don't know.

"Q. Tell the jury whether or not you saw his hands before he went over to the door? A. Oh no, I didn't.

"Q. Did you see his hands then? A. Only, what you mean, I saw him when he left the dresser, he had a pistol when he left the dresser.

"Q. When he left the dresser he had a pistol; did he do anything with the pistol before he went to the door? A. No sir.

"Q. Did he have that pistol in his hand when he went to the door? A. I reckon he did, I don't know.

"Q. Did you see it or did you not see it? A. I saw it when he went to the door.

"Q. Did you see his hands at the time he threw his hands up to his head as you have indicated? A. Sure he had his hands when he done that, what he had in it, I didn't see anything in it at all.

"Q. You could see his hands? A. Why sure.

"Q. You didn't see anything in his hand? A. I didn't see anything in his hand.

"Q. Then would you say he didn't have anything in his hand? A. He didn't have anything in his hand."

The testimony of the three police officers who went to the scene of the homicide and later arrested the defendant added nothing material to the facts as already stated, except this. The defendant having disappeared, the police went to the home of his counsin, Ida Griffin, the State's first witness, where he had got the pistol, and found the weapon in the hallway. From there they went to an address on Olive Street, apparently some distance away, and found the defendant. He told the officer his name was Williams. The officer threatened to take him to the place where he worked and find out his true name, whereupon the defendant admitted his name was Amos Carroll. The officer further asked the defendant "if he shot that man," and the defendant countered, "Is the man dead?" The officer questioned, "What man?" and the defendant replied, "Well I hope he dies, because I meant to kill him."

The body of the deceased Clark was taken to City Hospital No. 2 in St. Louis. Dr. Weathers, a physician and surgeon there made a superficial examination and found death apparently had been caused by a "gun shot wound below the tip of the left ear."

The defendant testified he had known the deceased Clark for about three years. He said in March, before the killing in May, Clark was in destitute circumstances and came to live with him. During that time the deceased hurt his back and the defendant furnished the money for two days' medical treatment and supported him and his children until the latter part of April when Clark left. In the meantime Clark had got a job the first of that month. He was to pay the defendant six dollars per week for board and room but he did not pay it. Altogether Clark owed him about forty-five dollars. About two weeks later the defendant saw Clark and the latter "dunned himself," and said he would go to the place where he was living and get some money to apply on defendant's bill. The defendant waited a while and Clark did not appear, so later that same evening he went twice to Clark's house, where he was rebuffed by the women folks and told Clark was not there. The defendant then sued Clark and garnished his wages.

On the evening of May 12 he went to Clark's home about 6:20. He did not see the two Condreys sitting on the steps next door. The witness Dee Rankin was not in the room with Clark as Rankin had testified. The defendant knocked on the door. Clark opened it. The defendant said: "What are we going to do about my money, boy I needs it." Clark cursed him and said, "Didn't you stop my pay check last week?" Then he threw his hand behind him toward his hip pocket and the defendant shot him, thinking Clark was about to do him great bodily harm, as he had sometime previously threatened to do. The defendant then told about leaving the scene of the homicide and of his subsequent arrest. He denied having told the officer his name was Williams or Baker, or that he meant to kill Clark. On the contrary he declared he gave his true name and stated he had shot Clark to protect himself.

On cross-examination the State's counsel asked him if he brought "this pistol," apparently referring to the weapon previously introduced in evidence, to Clark's house, and the defendant answered "Brought that pistol, I had it in my pocket." Then he said he started with "a pistol" to the home of a friend, intending to borrow some money on it for eight or ten days. On the way it occurred to him he might get Clark to pay him two or three dollars on account, so he went by Clark's home without any intention of using the weapon. He used it after he got there because of Clark's threatened assault on him. He then denied he was at Ida Griffin's house that evening, denied he got the pistol from her, and denied he took it back to the hallway of her home after the shooting. He said he lost the pistol he used out of his pocket, as he was running from the scene of the killing.

■■ I. Looking first to the record proper. The defendant was indicted by a grand jury; there was no need of a preliminary hearing. [Sec. 3503, R. S. 1929; State v. Gieseke, 209 Mo. 331, 339, 108 S. W. 525, 527.] The indictment is in due form. The record fails to show the defendant's presence when the cause was continued in May, 1930, to the next term of court. This was unnecessary. [State v. Hall, 189 Mo. 262, 87 S. W. 1181.] Likewise, it does not appear the defendant was present when his motions for new trial were overruled. This is no ground for reversal unless it is affirmatively shown that the defendant was denied that privilege. [State v. Lewis, 80 Mo. 110.] The record shows an arraignment and plea of not guilty; that the trial proceeded on the indictment, the defendant being present and the jury duly impaneled and sworn; that a verdict was returned in form complying with the law, allocution accorded, and judgment and sentence were pronounced. We find no error in the record proper.

II. The verdict was returned on September 23, 1930. Within four days, on September 27, a motion for new trial was filed in behalf of defendant by the attorneys who represented him in the trial. No request was made for an extension of time under Section 3735, Revised Statutes 1929, to file an additional motion, or to file affidavits. Nevertheless, on September 30, seven days after the return of the verdict, the defendant filed a new motion for new trial, signed by another lawyer. The record shows this motion was filed, but does not say it was filed by leave of court. The motion, itself does recite that fact, but this does not prove it, as motions do not prove themselves. One of the grounds set up in the motion is newly discovered evidence. On October 1, three affidavits were filed, intended to support this ground of the motion, without any showing of leave granted. The trial court apparently entertained both motions on their merits, and overruled them. We likewise shall consider both motions in view of the nature of the case, but our action in so doing is not to be considered a precedent authorizing the filing of belated motions for new trial where no order granting an extension of time under the statute has been made before the expiration of the period within which the motion would have to be filed in the absence of such extension. This point has not been directly passed upon, so far as we are aware, but on the general subject see State v. Lackmann (Mo.), 12 S. W. (2d) 424, 426; State v. Embry (Mo.), 18 S. W. (2d) 10, 11; State v. Schmitz (Mo.), 46 S. W. (2d) 539, 540; State v. Ryan (Mo.), 50 S. W. (2d) 999.

The second motion in this case does not in any way refer to the first. In entertaining both it is not to be understood we are receding from what is said in State v. Burns, 312 Mo. 673, 679, 280 S. W. 1026, 1028, 44 A. L. R. 848, to the effect that a timely amended motion for new trial operates as an abandonment of the original when the former fails to make appropriate reference to the latter in such way as to evidence continued reliance on the grounds assigned in the first motion.

III. The first and second grounds in the first motion are identically the same as those held insufficient in State v. Francis, 330 Mo. 1205, 52 S. W. (2d) 552, under previous decisions of this court, because of their failure to comply with the statute, Section 3735. That is to say they are merely general charges that the verdict is against the evidence and the weight thereof; and that the verdict is against the law as applied to the evidence and as set out in the instructions. The eighth ground in the first motion complains that the verdict is "unjust." The first ground in the second motion charges merely that the verdict is against the evidence; but it adds the further averment that there is no substantial evidence to support the verdict. This latter assignment we have consistently recog-

nized as being adequate to challenge the sufficiency of the evidence, but it is apparent from the statement of facts heretofore made that there was enough evidence to take the case to the jury and to sustain the verdict.

IV. The next two assignments in both motions are that the court erred in admitting incompetent, irrelevant and improper evidence offered by the State, over the objections of the defendant; and in rejecting competent, relevant and material evidence offered by the defendant. These assignments, also, are too general to preserve anything for review. [State v. Adams, 318 Mo. 712, 723, 300 S. W. 738, 743; State v. Moore (Mo.), 36 S. W. 928; State v. Hohensee, 333 Mo. 161, 62 S. W. (2d) 436.]

V. The next assignment in the first motion is that the court erred in permitting the panel of talesmen to separate after they had been examined, from which panel the jury of twelve was to be selected. This was discretionary with the court. Indeed, no request for the panel to be kept together in custody of an officer of the court was made by counsel on either side, so far as the record shows. [See Sec. 3678, R. S. 1929; State v. Golden, 330 Mo. 784, 51 S. W. (2d) 91; State v. Todd, 146 Mo. 295, 300, 47 S. W. 923, 924.]

VI. The next assignment in the first motion is that the remarks of the assistant circuit attorney in his closing argument constituted an appeal to race prejudice. It is stated the prosecutor asked the jury to set an example and bring in a verdict that would keep other "niggers" from shooting "niggers" and white men. The second motion says the jury was prejudiced against the defendant throughout the trial by and because of improper testimony and improper conduct and argument of the assistant circuit attorney; but it does not indicate even generally what testimony, conduct or argument are complained of. The argument of State's counsel is not preserved in the bill of exceptions. These assignments present nothing for review on appeal. The statement made in the first motion about what the attorney said does not prove itself.

VII. This disposes of all the assignments in the first motion except one that "the jury failed to deliberate on their verdict." The trial began on the morning of September 23. The court read its instructions to the jury about four o'clock that afternoon. Nothing is shown by the record as to the time consumed by counsel in argument. The record does show the verdict was returned on the same day, September 23, but at what hour does not appear. From all this it is impossible to tell how long the jury was out, other than it possibly could have been between four o'clock in the afternoon and

midnight. It was held in State v. Richmond, 321 Mo. 662, 669, 12 S. W. (2d) 34, 36, the fact that the jury deliberated only one and one-half hours before returning a verdict of second degree murder was of itself insufficient to warrant interference therewith. The statute permits a jury to return a verdict even without retiring from the courtroom. [Sec. 3683, R. S. 1929.] We find nothing in the record showing the jury failed to deliberate. The motion for new trial specifies nothing. The point must be ruled against the defendant.

VIII. One of the remaining assignments in the second motion for new trial is that the court erred in failing to give an instruction on manslaughter. In our opinion the court's action was correct. No instruction on that grade of homicide was called for. The evidence does not show the deceased inflicted actual personal violence —a battery—upon the defendant. For that matter it does not show even a hostile demonstration with a deadly weapon by the deceased. On the defendant's testimony the most that can be said is that the deceased reached toward his hip pocket in a threatening manner, at the same time uttering opprobrious epithets. The equivocal testimony of the State's witness Dee Rankin perhaps tends to show the deceased had a pistol when he went to the door, responding to the deceased's knock, but Rankin does not say the deceased made a demonstration with the weapon, and it was not found after the shooting, so far as the record shows. According to the defendant if the deceased had a pistol it was in his pocket and he did not get it out or display it before he was shot and killed. The issues presented by the evidence made either a case of murder or justifiable homicide under the law of self-defense. [Sec. 3985, R. S. 1929; State v. Bongard, 330 Mo. 805, 51 S. W. (2d) 84, 88.]

IX. The sixth ground in the second motion is that "there is newly discovered evidence which said defendant did not and could not have at the trial of said cause; that said evidence is relevant and so material that it would probably produce a different result, and that it could not, by reasonable diligence, have been discovered before the trial." The motion was signed by a lawyer who had not been attorney of record for the defendant at any previous stage of the case, but was not verified by the attorney, the defendant or any one else. Again we can only say motions for new trial do not prove themselves and that this motion is altogether lacking in definiteness and states only conclusions. [State v. Hohensee, 333 Mo. 161, 62 S. W. (2d) 436.] The three affidavits filed on October 1 are substantially in the same language. What they all say is that in the community the deceased Clark, "was generally known to be and was a vicious, fighting and dangerous man," or "type of man;"

and "that to this affiant's own knowledge said Roy Clark has been guilty of assault and battery upon individuals with dangerous and deadly weapons." We understand these affidavits attempt to charge two things: bad reputation of the deceased for peace and quiet; specific acts of violence against third persons.

Neither the motion nor the affidavits say the defendant was acquainted with the deceased's alleged reputation for quarrelsomeness and turbulence when the shooting occurred. The contrary was by necessary inference affirmed for it is averred the proposed evidence was "newly discovered." It has been held uncommunicated *threats* made by the deceased against the defendant are competent as tending to show who was the probable aggressor. [State v. Burns, 278 Mo. 441, 448, 213 S. W. 114, 117.] But it seems not to be the law of this State or generally elsewhere that the *bad reputation* of the deceased for quarrelsomeness and turbulence is admissible on the issue of self-defense unless the defendant knew of it. State v. Kennade, 121 Mo. 405, 415, 26 S. W. 347, 350, so decided. In State v. Feeley, 194 Mo. 300, 320, 92 S. W. 663, 668, 3 L. R. A. (N. S.) 351, 112 Am. St. Rep. 511, it was held the Kennade case "should not longer be followed" on that point. But in State v. Barrett, 240 Mo. 161, 173, 144 S. W. 485, 488, the question was re-examined and this court said a consideration of the many decision reviewed in the L. R. A. annotation to the Feeley case "has convinced us that the current of authority is in accord with the doctrine of" the Kennade case and an earlier decision. In Davenport v. Silvey, 265 Mo. 543, 552, 178 S. W. 168, 170, L. R. A. 1916A, 1240, a civil suit, the opinion made an *obiter* observation that previous knowledge of the turbulent disposition of the party assaulted or killed is not required, citing the Feeley case as overruling the Kennade case, and saying, "This ruling in the Feeley case is, as I understand it, the rule of the court at this time." In State v. Turnbo (Mo.), 267 S. W. 847, 849, apparently the last case on the point, the exclusion of evidence of the general reputation of the party assaulted for quarrelsomeness and turbulence was held error *because* the defendant knew it. [See, also, 64 A. L. R., note, p. 1041.]

Another point to be considered is that the affidavits allege the deceased was *generally known* in the community to be a vicious, fighting and dangerous man. The defendant had lived for four years at the place where he resided on the date of the homicide. He had known the deceased Clark about three years. How, then, can it be said he was diligent when he failed until after the trial of his case to discover what was generally known in the community? [State v. Hewitt (Mo.), 259 S. W. 773, 781; State v. Arnett (Mo.), 210 S. W. 82, 84.]

As to the other part of the affidavits, that to the affiants' knowledge the deceased had been guilty of assault and battery upon

individuals with deadly weapons. This evidence of specific acts and prior difficulties with third persons would have been incompetent if it had been offered at the trial, State v. Allen, 290 Mo. 258, 278, 234 S. W. 837, 843, unless so proximately connected with the homicide for which the defendant was on trial as to affect the defendant's mental condition at that time. [State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556, 564.] Neither the motion nor the affidavits attempt to make any showing in this regard. ■ The trial court has a wide discretion in passing on assignments in motions for new trial based on newly discovered evidence. We think the motion in this case was correctly ruled.

■ X. The final assignment in the second motion for new trial is "that the punishment is excessive and unreasonable." We are unable to take that view of the case. By his own admission the defendant went to the home of the deceased armed with a revolver, knocked on the door, and shot him in the head within less than a minute. According to the State's proof he had procured the weapon by stealth only a short time before that. He approached Clark's home with the weapon partially concealed in his sleeve and ready for instant use. He fled, and when first apprehended gave a false name. Then he declared he meant to kill Clark. All this evidence, as well as the testimony given by the defendant to show self-defense, was for the jury. We find no reversible error in the record. The judgment must be and is affirmed.

Date of execution set for Friday, September 22, 1933. All concur.