# THE STATE v. GEORGE PEAK, Appellant.

Division Two, February 18, 1922.

1. **WITNESSES: Indorsement on Information.** The requirements of the statute (Sec. 3849, R. S. 1919) relating to the indorsement of the names of material witnesses for the State upon indictments apply to informations.

2. ———: ———: **No Showing of Prejudice.** The indorsement upon the information of the names of witnesses for the State after the trial has begun will not be error unless defendant shows he was prejudiced thereby.

3. ———: ———: **Manner of Objection.** Objection to the indorsement of the names of witnesses for the State upon the information after the trial has begun, should be in the form of a motion to quash, or, if the facts warrant it, by an application for a continuance; and if not so made the objection is not entitled to consideration.

4. **DYING DECLARATIONS: Scope: Admissibility.** A dying declaration should be restricted to the identification of the accused, the act of killing and the circumstances immediately attending the act, and to be admissible in evidence should have' been made in the presence of a realization of impending death and in the absence of a hope of recovery.

5. ———: **Admissibility: Sense of Death.** Where deceased said to the officer that he knew he was in a serious condition and about to die and that he made the declarations as a dying statement, the declarations were admissible in evidence.

6. **INSTRUCTION: Murder: In Connection with Robbery: Definition of Deliberately.** Where the information charges murder in the first degree, and the evidence shows that the murder was. committed in an attempt to rob deceased, although not alleged, defining the word "deliberately" in the instructions is not error.

7. ———: ———: ———: **Defining Robbery.** Evidence that the homicide was committed in the prepetration of a robbery is admissible under the general charge of murder in the first degree, and the charge of robbery not being necessary the instructions may designate the robbery by the term by which it is usually known and a further definition is not necessary.

8. ———: ———: ———: **Defining Terms.** Where the homicide was committed in the prepetration of one of the felonies named in the statute (Sec. 3230, R. S. 1919), it is unnecessary, in the

trial of the charge of murder in the first degree, that the instructions define the words premeditation and deliberation.

9. ————: Consideration of Dying Declaration: Comment. An instruction defining the manner in which a dying declaration should be received, containing no statement of its sufficiency or value, is not a forbidden comment on the weight of the evidence.

10. ————: ————: Admissibility: Determination by Jury. The instruction, after stating the facts necessary to render the statements of deceased a dying declaration, told the jury it was their duty so to consider and give to them such weight as they might think them justly entitled to upon their consideration in connection with all the other facts and circumstances disclosed by the evidence; that they should consider that such statements were not made in the presence of defendant; that declarant was not subject to the tests of cross-examination; that the jury were not afforded an opportunity to observe his manner, and that he was not subject to prosecution for perjury if said statements or any part of them were untrue. Held, that the court did not by said instruction leave to the jury a determination of the admissibility of said dying declaration, but itself determined the character of the statements, and restricted the jury to determining the weight and credit to be given to them.

Appeal from St. Louis City Circuit Court.—*Hon. Vital W. Garesche*, Judge.

AFFIRMED.

*Thos. J. Rowe, Jr.*, and *Ferris & Rosskopf* for appellant.

(1) The court erred in giving Instruction 1. (a) It unnecessarily and erroneously includes a definition of "deliberately." This is a prosecution for a homicide committed in the perpetration or attempt to perpetrate robbery, and deliberation is not an essential element of that crime. R. S. 1919, sec. 3230; Kelley's Criminal Law (3 Ed.), sec. 486, p. 431; State v. Garrett, 276 Mo. 302; State v. Carroll, 232 S. W. 699. (b) The evidence supports no theory of homicide except that committed in the perpetration or attempt to perpetrate robbery, and said instruction does not present that theory, or include

State v. Peak.

that form of homicide in defining murder in the first
degree. (c) The definition of "deliberately," even if
permissible in ordinary cases, which we do not admit,
contains surplusage in the language, "in furtherance of
a formed design to gratify a feeling of revenge, or to ac-
complish some other unlawful purpose," and said sur-
plusage is confusing and misleading as applied to the
evidence in this case, which touches upon the purposes
to kill, to rob, to sell whisky. State v. Davis, 226 Mo. 515;
State v. Bobbst, 269 Mo. 225; State v. Duestrow, 137
Mo. 67. (2) The court erred in giving Instruction 2
for the reason that said instruction does not define the
term "robbery," a definition necessary in describing the
offense of homicide committed in the perpetration or at-
tempt to perpetrate robbery, and necessary for the in-
formation of the jury. State v. Nichols, 222 Mo. 434;
State v. McCaskey, 104 Mo. 648. (3) The court erred
in giving Instruction 2a, whereby the court submitted to
the jury for determination the question of the admis-
sibility of the alleged dying declarations. It was the
duty of the court, not the jury, to determine the funda-
mental facts authorizing the admission of dying declara-
tions in evidence. The failure of the court to exercise
its function in that respect was reversible error. State
v. Zorn, 202 Mo. 31; State v. Wilks, 213 S. W. 118; State
v. Gow, 235 Mo. 326; State v. Johnson, 118 Mo. 491. (4)
The court failed and refused to instruct the jury upon
the law applicable to the facts in evidence which support-
ed defendant's defense and his theory of the case. The
court thereby erred in failing to instruct the jury in
writing upon all questions of law arising in the case which
were necessary for their information in giving their ver-
dict. R. S. 1919, sec. 4025; State v. Weinberg, 245 Mo.
575; State v. Starr, 244 Mo. 161; State v. Conway, 241
Mo. 284; State v. Douglass, 258 Mo. 281; State v. Bid-
strup, 237 Mo. 285; State v. Coff, 267 Mo. 21; State v.
Partlow, 90 Mo. 626; State v. Brown, 104 Mo. 365; State
Nichols, 222 Mo. 434. (5) The court erred in per-
mitting the names of witnesses Curtis and Kirk to be

indorsed on the information after the trial began, and
erred in permitting them to testify upon the trial, and
erred in not striking out the testimony of Kirk on motion
of the defendant. State v. Barrington, 198 Mo. 23; State
v. Nettles, 153 Mo. 464. (6) The court erred in admitting
evidence of the alleged dying declarations. No legal
foundation was laid for their admission. Madison was
not mentally capable of making a statement. He was
not under the impression of impending and immediate
death and without hope. The declarations and state-
ments attributed to him were incomplete and indefinite,
and were extracted from him by undue urgency. It is
apparent he was not accurately quoted. The alleged
statements made at Madison's home did not identify de-
fendant as the guilty party with sufficient certainty, and
those made at the hospital were apparently untrue. State
v. Johnson, 118 Mo. 491, 501; State v. Colvin, 226 Mo.
446, 481.

*Jesse W. Barrett*, Attorney-General, and *Albert Mil-
ler*, Assistant Attorney-General, for respondent.

(1) The court did not commit error in permitting
names of witnesses, Kirk and Doctor Curtis, to be in-
dorsed upon the information, and in permitting said wit-
nesses to testify. These names were so indorsed on the in-
formation before the jury was sworn to try the case. De-
fendant's plea of not guilty was not withdrawn and no mo-
tion to quash or for a continuance was filed. Defendant, be-
fore making objections, announced ready for trial. The
fact that a witness's nams is not indorsed on the informa-
tion does not render his testimony incompetent. State v.
Stiefel, 106 Mo. 129; State v. Nettles, 153 Mo. 464; State
v. Barrington, 198 Mo. 23; State v. Robinson, 263 Mo.
318; State v. Kehoe, 220 S. W. 961. (2) The declaration
of the deceased, made shortly prior to his death to wit-
nesses Kirk, Doctor Curtis and Nannie Madison, were
properly admitted. (a) It appears that deceased be-
lieved he was about to die when he made the statements.

State v. Lewis, 264 Mo. 420; State v. Colvin, 226 Mo. 446; State v. Kelleher, 201 Mo. 614; State v. Nelson, 101 Mo. 464; State v. Draper, 65 Mo. 335. (b) The cause of declarant's death was the subject of the declaration. State v. Lewis, 264 Mo. 420; State v. Horn, 204 Mo. 528; State v. Spivey, 191 Mo. 87; State v. Parker, 172 Mo. 191; State v. Draper, 65 Mo. 335. (3) The court did not commit error in giving Instruction 2a. State v. Mc-Mullin, 170 Mo. 625. (4) The instructions given covered every legitimate aspect of the case and left nothing to be desired. Those refused defendant were properly refused, either as not correctly stating the law or as being covered by those previously given.

WALKER, J.— Appellant was charged by information in the Circuit Court of the City of St. Louis with murder in the first degree, and upon a trial was convicted and sentenced to imprisonment in the penitentiary for life. From this judgment, he appeals.

The appellant and one Hardamon went, about eight or nine o'clock of the night of the crime, to the place of business of the deceased on Nineteenth and Market streets in the city of St. Louis. Hardamon entered and told the deceased that the appellant had nine cases of liquor which he would sell to him if taken that night. The deceased agreed to buy it, and Hardamon went out and brought in the appellant, and it was agreed that the deceased would buy the liquor. Hardamon then left, and the other two continued the conversation.

Appellant and the deceased made an estimate of the total amount that would be due for the liquor at the price agreed upon and soon thereafter the appellant left, saying that about half past ten that night he would return and accompany the deceased to the place where the liquor was to be delivered. Appellant returned at about ten o'clock p. m., and the partner of the deceased, in the presence of the appellant, counted out and delivered to the deceased the necessary money, $423, to pay for the liquor. The deceased then called up two employees, or

associates, of his in another business and asked them to come to his place with an automobile truck to convey him and the appellant to where the liquor was to be delivered. The truck was brought, and the deceased, the appellant and the two others entered it and went away together. When they reached the corner of Marcus Avenue and Lewis Place, the appellant and the deceased alighted from the truck and went across Lewis Place, leaving the two others in the truck. Soon thereafter the latter heard appellant, deceased and, possibly, others talking about the whiskey and its location, when three shots were heard. Watson, one of the persons left in charge of the truck and who was at the wheel, drove it to the north side of Lewis Place in the direction from whence the sounds of the shots had come, when the other employee, Neal, discovered the deceased, and upon reaching him said: "Are you shot?" To which the latter replied: "Yes, I am shot all to pieces." Just before the inquiry and immediately following the shots, three men were seen running away from the scene. The appellant did not return to the truck and was not seen that night by either of the persons who had been left in charge of the truck. As the deceased was being taken to his home, he repeated that he was shot all to pieces and said that his assailants had taken his gun from him. A physician was called immediately upon the arrival of the deceased at his home. When the physician reached the deceased, he found that deceased was suffering from three gunshot wounds; each had entered below the navel, passed through the abdominal cavity and came out through the back. The physician told the deceased that he was in a serious condition and suggested if he desired to make a statement, he should do so. The deceased said: "Am I going away?" To which the physician said: "I do not know. There is some chance for you, but whatever statement you want to make or business you have to attend to, you had better see to it before you go to the hospital." Deceased replied: "If I am going to die, that is all right. I don't mind it. I know I am done for." After some conversation with

his wife, who asked him why he didn't give up the money without resisting, he said: "It didn't come up that way." The physician then asked him: "Who were the men that shot you?" A revenue officer or a detective, present, interposed an inquiry which prevented the deceased from answering the physician, but he (deceased) said to the officer that the whiskey thieves shot him; and that he knew the man who rode out with him, but didn't know his name; that "Slick," his partner, "would know the name of the colored boy who brought the man to deceased's place before they started out." A number of people were present when the deceased made this statement. Among others, were the two employees of the deceased and several police officers. To the acting chief of police, the deceased reiterated the statements theretofore made to the physician in regard to the manner in which the shooting occurred, saying that he knew he was in a serious condition and about to die, and with the knowledge of this fact made the statements in regard to the shooting. In a reply to a further inquiry of the officer, deceased said that he was shot by the man that rode out in the car with him to Marcus Avenue and Lewis Place to purchase some whiskey; that after arriving at Marcus Avenue and Lewis Place, he and the white man got out of the car and a short distance away met two other white men. There was some conversation about the whiskey, when the man that had ridden out with him drew a revolver and said: "The hell with the whiskey. Put up your hands. Your money, we want." That they searched him, took his revolver and then shot him. He died at the City Hospital, from the gunshot wounds received as aforesaid, about four hours after he was shot.

About one thirty a. m., on the morning succeeding the commission of the crime, the appellant, who lived at a place called the Madison Hotel, between Eighteenth and Nineteenth Streets on Market Street, St. Louis, called a taxi to take him and one John Pittaluga and two women out to a roadhouse in St. Louis County. They remained

there until about four-thirty o'clock a. m., when they returned to the hotel, where the appellant was arrested.

Several witnesses for the defense testified to the good reputation for honesty of the appellant. In his own testimony, he corroborates the State's witnesses as to his going out with the deceased and the others for the purpose of securing the delivery of the whiskey, which he says he had been told was there for sale. His account of the occurrences after they reached the place where the whiskey was to be delivered, is as follows: "We got there and Madison (deceased) suggested that we stop the machine at the corner, and said: 'Let's get out and see where we go; where you got to drive here; first, whether the back or front.' We got out and walked diagonally across the street. Just as we got on the other side of the street, there were three men coming and as we got to them, they stuck us up. They said: 'Put up your hands.' As they did, Madison pulled a pistol and they all three jumped on him, and I ran away. I heard several shots. I got on the Taylor Avenue car, transferred to Olive and got off at Compton and Olive. I went to the Madison Hotel, where I live. I did not know that Madison had been shot. I thought that he had shot somebody else. I stayed in the hotel about an hour, I suppose, and then I went out into the country. I first learned that Madison was shot when I came back and was arrested. I told the police exactly what I am telling here."

Appellant denied that he shot the deceased, and testified that he had nothing to do with any one who was waiting to meet the latter, or to either shoot, kill or rob him. The jury gave no credence to his testimony.

I. The errors assigned are purely technical. The first is that the names of certain witnesses, to-wit, the police officer and a physician, were not indorsed on the information until after the trial had begun. The statute (Sec. 3849, R. S. 1919) makes the same requirement as to the indorsement of the names of witnesses

Witnesses:
Indorsement
of Names on
Information.

for the prosecution upon informations as in indictments, the latter statute being as follows:

"When an indictment is found by the grand jury, the names of all the material witnesses must be indorsed upon the indictment; other witnesses may be subpoenaed or sworn by the State, but no continuance shall be granted to the State on account of the absence of any witness whose name is not thus endorsed on the indictment, unless upon the affidavit of the prosecuting attorney showing good cause for such continuance." [Sec. 3889, R. S. 1919.]

As in the Kehoe Case, 229 S. W. 961, the names of the witnesses objected to were not indorsed on the information until after the trial had begun. In that case the counsel for the accused, upon the witnesses being called to testify, objected on the ground that their names had not been indorsed on the information and alleged surprise and lack of preparation to meet their testimony. The court permitted their names to be indorsed on the information and continued the case for three days. In the interval, counsel for the accused filed a motion to quash, alleging a knowledge of these witnesses' names by the State when the information was filed, and that it was then known that their testimony was necessary to prove the *corpus delicti*. This was overruled. Whereupon counsel for the accused filed a motion, designated a motion for mistrial, and supported same by affidavit, stating that after the jury had been impaneled, sworn and the trial begun, and the defendant placed in jeopardy, the State and caused the names of the witnesses to be indorsed on the information; that these witnesses were believed by the movent to be intended to be used in the attempt by the State to establish the venue and the *corpus delicti;* that the suddenness with which the names had been added to the information deprived the defendant of an opportunity to impeach their credibility or to interrogate the jury with reference to their acquaintance with said witnesses. The court was asked to declare a mistrial and continue the case to the next term. This was over-

ruled, and the witnesses were sworn and testified. In the presence of these facts, we held, following the ruling of the court in State v. Barrington, 198 Mo. 23, in which many cases on this subject are reviewed, that a defendant could not complain of prejudicial error if he had sufficient notice that the additional witnesses would be introduced at the trial. Whatever surprise or lack of preparation to which the accused was subjected by reason of the failure of the trial court to sustain the motion of the accused, was remedied by the continuance of the case.

The Kehoe Case reviews a number of later cases than the Barrington Case, not necessary to be summarized here, except to say that their trend is to the effect that there must be some showing of prejudice on the part of the accused to render an objection of the character here made worthy of consideration.

In the case at bar the objection made both to the testimony of the police officer and that of the physician was that their names had not been indorsed upon the information until after the trial had begun and without the defendant having been given notice that they would be used as witnesses. There was no claim of surprise or lack of preparation, and consequently no showing of prejudice. There was therefore no substantial reason why the objection should have been sustained. In addition, the manner in which the objection was made does not conform to the well-established requirements of our practice. We held in State v. Ferguson, 278 Mo. l. c. 134, that where an objection of this character is made, it should be in the form of a motion to quash, or if the facts required, an application for a continuance. To a like effect are the more recent rulings of this court in State v. Lee, 231 S. W. l. c. 622, and cases cited and State v. Howerton, 228 S. W. l. c. 746. In addition, therefore, to there being no merit in this contention on account of an absence of prejudice, it was not made in a manner to entitle it to consideration.

II.   The second assignment of error is as to the inadmissibility of the dying declaration of the deceased. The rule here as elsewhere in regard to dying declarations is that they should be restricted to the identification of the accused, the act of killing and the circumstances immediately attending the act, forming a part of the *res gestae;* and to render them admissible, that they should be made in the presence of an impending realization of death and in the absence of a hope of recovery; or, as Lord Chief Baron EYRE, said in Woodcock's Case (2 Leach, 563): "They are declarations made in extremity when the party is at the point of death and when every hope of the world is gone; when every motive to falsehood is silenced and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn and so awful is considered by the law as creating an obligation equal to that imposed by a positive oath administered in a court of justice."

**Dying Declaration.**

Measured by these principles, what were the declarations of the deceased to which objections were made and the circumstances attending their making?  It should be borne in mind that in all material matters the declarations made by the deceased to the physician and those made to the police officer a little later were the same.   Having been made under the restrictions we have indicated, they were not objected to except on the ground of not being made *in extremis.*   The declarant said to the officer that he knew he was in a serious condition and about to die and that he made the declarations as a dying statement. This fully fills the measure of the requirement necessary to the admission of a dying declaration.   There is nothing in the cases, cited by appellant, of State v. Colvin, 226 Mo. l. c. 481, and State v. Johnson, 118 Mo. l. c. 501, which militates against this conclusion.   On the contrary, the ruling of the trial court finds support not only in these but in many recent cases in which every phase of the question has received considerate attention.   [State

v. Hostetter, 222 S. W. l. c. 752; State v. Rozell, 225 S. W. (Mo.) l. c. 932; State v. Wilks, 278 Mo. l. c. 488.]

This contention is, therefore, not sustained by the facts, and is overruled.

III.   The third assignment of error is that the giving of instruction numbered one erroneously includes a definition of the word "deliberately." The basis for this contention is that this is shown to be a prosecution for a homicide, committed in the perpetration or the attempt to perpetrate a robbery, and that deliberation is not an essential element of the crime as thus charged.

*Defining Deliberately.*

It is held in some jurisdictions that if a wilful, deliberate and premeditated crime is charged and the proof shows that the killing was in the commission of a felony but not an intentional, deliberate killing, there is a fatal variance. [People v. Olmstead, 30 Mich. 431; Mitchell v. State, 1 Tex. App. 194.]   This rule does not apply in Missouri.   Here if the killing is alleged to have been done deliberately, premediatedly, etc., it will be sufficient to charge murder in the first degree, whether the testimony shows that the crime was committed in the perpetration or attempt to perpetrate one of the felonies named in the statute (Sec. 3230, R. S. 1919) or otherwise.   Upon such a general charge it may be shown as an incident that the crime was committed in the perpetration of one of the felonies named; and if therefore, as in the instant case, the jury is instructed that they must so find to authorize a conviction, a definition of the word deliberately, or any other of the essential elements of the crime if charged generally, although rendered nonconstituent by the proof, will not be held to be error because the appellant has not thereby suffered injury. [State v. Bobbitt, 215 Mo. l. c. 41.]

The error in the Garrett Case, 276 Mo. 302, which caused its reversal, was not in the improper defining of the word deliberately in the instructions, but a failure

to define it, where, under the facts, it was a constituent element of the crime.

Whatever reasoning is found in State v. Carroll, 232 S. W. l. c. 702, which may be held applicable to the case at bar, is adverse to the contention of the appellant in that it is there held that an incident to a crime, for example, the manner in which it is perpetrated, may be shown in the absence of an allegation in the charge in regard thereto, and it will not constitute error if the jury's attention is not called to same.

Here, while the perpetration or attempt to perpetrate the robbery was not charged, evidence was introduced in regard to same to show the incident or condition under which the crime of murder was committed, and the jury was told that it could not convict unless they found such condition. This was more than the appellant was entitled to, and being in his favor he has no cause of complaint.

IV.   There is no merit in the contention that the instruction numbered two does not correctly define who are principals if acting together with a common intent in the commission of the crime. This instruction follows many well-established precedents on this subject and is immune from this criticism.

**Defining Principal.**

The further contention is made that the word "robbery" should have been defined as used in the instruction hypothesizing the condition under which the homicide was committed. The information did not charge this condition. We have shown in discussing another phase of this case that it was not necessary to charge that the murder was committed in the perpetration of the robbery, but that evidence in regard thereto was admissible under the general charge; it not being necessary, therefore, to charge the robbery in the information, it was sufficient in the instruction to simply designate it by the term it is usually known, either as robbery or an attempt to rob. As a general rule, it is only necessary to define words employed in instructions

**Defining Robbery.**

when they constitute essential elements of the crime charged. The word robbery as here used not belonging to that class but simply designating the condition under which the crime was committed, its formal definition was unnecessary. We have frequently held that where a homicide was committed in the perpetration of one of the felonies designated, that it was unnecessary to define the words premeditation and deliberation; these in the usual charge would require definition. Certainly, therefore, where the word used in the instruction is only definitive of a condition, its definition becomes unnecessary. [State v. Daly, 210 Mo. l. c. 679, and cases.]

V. The giving of instruction numbered 2a, defining the manner in which dying declarations
Instruction on Dying Declaration. should be considered by the jury, is assigned as error. It correctly declares the law and is in the language employed in a like instruction approved by this court in State v. McMullin, 170 Mo. l. c. 625.

Considered, however, in the light of reason rather than that of precedent, the instruction does not violate the rule forbidding a comment upon the weight of the evidence. By this we mean that it does not contain statements as to the sufficiency or value of the evidence of the declarant or any part of same. To express the definition differently, there is no attempt made to differentiate said testimony and tell the jury that it is entitled to great or little weight in violation of the statute (Sec. 4038, R. S. 1919) and the rulings thereon. [State v. Rogers, 253 Mo. l. c. 412; State v. Sivils, 105 Mo. 533; State v. Smith, 53 Mo. 267; State v. Hundley, 46 Mo. 414.]

Nor is the instruction obnoxious to the criticism that the admissibility of the declarations was left to the jury. The trial court, after stating the facts necessary to render the statements of the deceased dying declarations, told the jury, in effect, that it was their duty to so consider and give them such weight as they might think them justly entitled to upon their consideration with all the

State v. Peak.

other facts and circumstances disclosed by the evidence; and that they should consider that such statements were not made in the presence of the defendant; that the declarant was not subject to the tests of cross-examination; that the jury was not afforded an opportunity to observe his manner, and that he was not subject to prosecution for perjury if said statements or any part of them were untrue.

In substantially the same language was the instruction in regard to dying declarations approved by this court in State v. Hendricks, 172 Mo. 662..

From the foregoing it is evident, in the instant case, that the character of the statements as dying declarations was determined by the court, and that the province of the jury was limited to determining the credit or weight to which the declarations were entitled.

As we said in State v. Crone, 209 Mo. l. c. 329: "This instruction admits in no uncertain language that the statement made by the deceased on the morning of the day upon which she died was competent evidence, and then proceeds to tell the jury the facts necessary to be found by them to constitute a dying declaration, and the weight to be given it by them in passing upon the guilt or innocence of the defendant." The reason for the ruling in the Crone Case has, without reference to same, found expression in State v. Creely, 254 Mo. l. c. 395, 162 S. W. l. c. 740, in which we said that "while courts are prohibited generally from selecting certain parts of evidence and telling the jury how they shall weigh same, there are certain classes of evidence which, by law, are presumed to prove certain things; and as to those particular classes of evidence it is not improper for the court to tell the jury what facts they prove, or tend to prove."

There is no basis for the contention that the court did not instruct the jury upon all the law applicable to the case under the testimony.

VI.   Certain remarks of the attorney for the State in his argument to the jury are assigned as error.   An

examination of the record discloses no remarks that may not, under a reasonable interpretation, be held to be legitimate comments upon or deductions from the evidence. As such they do not constitute error, and there is no merit in the assignment.

**Argument to Jury.**

Finding no error authorizing a reversal, the judgment of the trial court is affirmed. All concur; *David E. Blair, J.,* in result.