THE STATE v. J. B. ADAMS, Appellant.—300 S. W. 738.

Division Two, December 12, 1927.

*T. C. Tadlock* for appellant.

*North T. Gentry,* Attorney-General, and *J. D. Purteet,* Special Assistant Attorney-General, for respondent.

HENWOOD, C.—An information was filed in the Circuit Court of Jasper County charging appellant with embezzlement, in four counts.

At the close of its case the State elected to stand on the first count, in which he was charged with the embezzlement of certain diamonds while the same were in his possession as the agent of the owner. The jury found him guilty and fixed his punishment at imprisonment in the penitentiary for a term of three years. He was sentenced in accordance with the verdict, and was then granted an appeal to this court.

As we gather the facts from the record, it appears from the State's evidence that the prosecuting witness, E. Rose, was an elderly man who had been in the jewelry business in the city of Joplin for fifty years. At the time in question, he had quit the regular jewelry-store business and was engaged in appraising diamonds for banks and other money lenders and in handling diamonds for others as a broker. In the fall of 1923 he had four transactions with appellant, in which he turned over certain diamonds to appellant to sell for him, and appellant sold the diamonds and accounted to him for the same. On April 14, 1924, he placed in appellant's hands for sale a pair of white gold ear-screws set with diamonds, weighing together 1.80 carats, and a ladies' white gold ring set was a one-carat diamond, with the understanding and agreement that he and appellant would divide equally the profits realized over and above the wholesale price of each of these articles, in the event of a sale. Rose had received these diamonds on consignment from the Gray Jewelry Company, a brokerage firm of Kansas City, Missouri. The wholesale price on the ear-screws was $450, and $265 on the ladies' ring, although Rose testified that the fair market value of the ear-screws was about $1200, and that of the ladies' ring about $750. Appellant gave Rose a receipt for the ear-screws and the ladies' ring, and the receipt included another small ring which appellant later sold and accounted for. A few days later, appellant told Rose that "he was working" these diamonds on a mining deal at Tulsa, Oklahoma, and that, when the diamonds were paid for, there would be "a nice profit" to divide. On May 28, 1924, appellant returned from Tulsa and reported a good prospect for the sale of diamonds at Miami, Florida, and on that day Rose placed in his hands for sale two additional diamonds to take with him on the Miami trip. Appellant gave Rose a new receipt on May 28, 1924, covering the ear-screws, the ladies' ring, the small ring mentioned, and the two additional diamonds, and tore up the old receipt, which he had given Rose on April 14th. In two or three days appellant brought back the two additional diamonds mentioned and Rose credited him with the return of these diamonds on the back of the receipt. This receipt, which shows all diamonds received by appellant on April 14 and May 28, 1924, and all credits, was offered in evidence and identified as "Exhibit A." The receipt proper was written and signed by appellant, and the credits and ac-

counting on the back thereof were written and signed by Rose. Including credits written on the back of the receipt, indicated by the word "(over)," this exhibit reads as follows:

Joplin, Mo., May 28, 1924.

Received of E. Rose—

Diamonds as follows

1—3 25/100 ct. in gold ring value 950 (Returned)
1 pr. ear screws value 450
    about 90/100 ct. each
1—1 ct. diamond set in white gold ring (ladies) 265 No. 6405
1—53/100 ct. set in white gold ring (ladies) value 135

(paid)

    dinner ring value 235 (returned)
    to be returned on demand or value in cash

(over)                           J. B. Adams

    ring 325/100 returned 950.00
    ring dinner returned 235.00

                E. Rose

credit for draft for $135.00 in payment ring 53/100

                             E. Rose

36 cash is paid for diamonds add war tax of 4290
                                715.00
                           —————
                             757.90

Shortly after appellant returned from the Miami trip, he went back to Tulsa to further promote his mining deal, and "after it ran along for a few weeks" Rose demanded of appellant to return the earscrews and the ladies' ring. Rose was "trying to get the matter settled up." During the month of July, 1924, appellant sent Rose four special delivery letters from Tulsa, at short intervals, in all of which he discussed his mining deal there and referred in glowing terms to the profit that he and Rose would make out of the venture, by using the diamonds to secure the payment of another promoter's commission. In August appellant came to Joplin and told Rose the diamonds had been put in escrow for this purpose. Rose said to him, "You want to be very careful," and appellant replied, "They are in a bank and perfectly safe." Appellant continued to send Rose special delivery letters and telegrams at intervals, during the months of August, September, November and December, 1924, and January and February, 1925. These letters and telegrams are of the same tenor as the letter written in July, 1924, except that many of them seem to have been written in reply to urgent demands from Rose for the return of the diamonds. They contain various excuses and explanations for delay and repeated promises to return the diamonds or the cost price of the diamonds plus Rose's share of the profit out of the mining deal. All of these letters and telegrams were marked as exhibits and offered in evidence at the trial; also, one telegram, dated December 1, 1924, sent by Rose to appellant, in the following words: "Return diamonds not later than Tuesday night sure." Rose further testified that appellant knew that these diamonds had been sent to him on consignment by the Gray Jewelry Company and

were charged to him at the wholesale price; that he did not give his consent to appellant to use the diamonds in the mining deal or to put them in escrow in that transaction, and that appellant had his consent to take them to Tulsa for sale only; that he had no partnership arrangement with appellant in the mining deal or otherwise, and no agreement or understanding with appellant except that appellant was to sell the diamonds and divide the profits on an equal basis; that he repeatedly requested appellant to return the diamonds, and that appellant put him off, from time to time, until he finally concluded the diamonds were gone and notified the Gray Jewelry Company to that effect; that he did not know appellant had actually sold the diamonds in Joplin until after his arrest on this charge in October, 1925. As to this matter, Rose said: "I didn't know until after he had confessed at the jail. He was leading me right along with these letters; lying to me." And he further testified that the diamonds were never returned to him and that he received nothing in payment for them. On cross-examination, Rose said that he had nothing to do with the mining deal, but, after appellant told him the diamonds were held in escrow on the deal, he expected to share in the profits of the deal, if there were any profits.

Dr. J. W. Barson, a practicing physician and surgeon of Joplin, testified for the State that appellant tried to sell the ear-screws to him in the spring of 1924, and on May 9, 1924, came back and pawned the ear-screws with him for a loan of $150. In a few days he redeemed them and paid the loan of $150, plus $5, interest, and said he had sold the ear-screws. On June 10, 1924, he said that his sale didn't go through and he needed some money to use in a mining deal, and again pawned the ear-screws for a loan of $150. On June 27, 1924, he borrowed $50 more, thereby increasing the loan to $200. On July 2, 1924, he wanted to further increase the loan, and, after being refused any further loan, he sold the ear-screws to Dr. Barson for $300. In this transaction, appellant received the $100 due on the sale, after the payment of the $200 previously received by him in loans, and gave Dr. Barson a bill of sale covering the ear-screws. At this time, appellant told Dr. Barson that he acquired the ear-screws with money he made out of a mining deal. In this connection, the witness said: "He didn't mention Mr. Rose. If he had mentioned Mr. Rose, I don't suppose I would have bought his diamonds." This witness further said that he kept the ear-screws until the fall of 1924, when he sold them.

C. S. Poole, a jeweler at Joplin, also testified for the State. He said that appellant came to his store several times in the early part of May, 1924, and tried to sell him the ladies' ring, but they did not agree on the price; that on May 20, 1924, appellant returned and sold him the ring for $200, and said he needed the money in a mining deal.

This witness further said that he paid for the ring with a bank check and appellant cashed the check.

It further appears from the State's evidence that, following his arrest and while in jail at Joplin, appellant had a conversation with W. F. Gibson, chief of detectives at Joplin, Mr. Coyne, the prosecuting attorney, and Era Rose, son of E. Rose, concerning his disposition of the diamonds. As to this conversation, the witness Gibson testified that "he told two different stories about it. He first said he let some person in Oklahoma have these diamonds and then Mr. Rose showed him some letters. He said, 'I am going to tell the truth about it,' the second time we let them in. The second time he said: 'The diamonds are right here in town.'" "He said he sold a diamond ring to Mr. Poole for $100 and he had let Dr. Barson have some ear-screws for $325." "He said he had a mining deal on. He didn't say anything about Mr. Rose having it on."

Appellant took the stand and testified at length. He stated on direct examination that *he sold some diamonds for Mr. Rose* in September or October, 1923, and *continued to do so* "more or less" until October, 1925. He further said that in all of the other diamond transactions he either returned the diamonds to Mr. Rose or accounted for the sale of the same, but he and Mr. Rose had a "different agreement" on the ear-screws and the ladies' ring; that after he had made several attempts to sell the ear-screws and the ladies' ring, Mr. Rose said to him: "Adams, as long as you are so familiar with the mining game, can't we work these stones in on some deal?", and then he said to Mr. Rose: "I will try that;" that, when he first told Mr. Rose about the mining deal he was working on, Mr. Rose gave his consent to the use of the diamonds for that purpose; and that, later, when he further informed Mr. Rose about the deal, Mr. Rose said he thought it was all right and said go ahead. As to their agreement and understanding on the mining deal, he testified, "We were to first pay for the diamonds, $715, and then the profits were to be split, fifty-fifty, anything above that." And he further testified that no provision was made in their agreement for his expenses, and the only way he could use the diamonds in the deal was in getting expense money. On cross-examination, he admitted that he never had the diamonds at Tulsa, and said he "was using them for the expense." He further admitted that he never had the diamonds in his possession or in escrow when he sent Mr. Rose the letters and telegrams mentioned, from Tulsa, and said their agreement did not require him to keep the diamonds in his possession. And he further admitted that he twice pawned the ear-screws to obtain money loans from Dr. Barson and later sold them to Dr. Barson for $300; that he sold the ladies' ring to Mr. Poole for $200; and that he never did tell Mr. Rose about these transactions. As to this matter, he said: "It wasn't

necessary.'' He was repeatedly asked, on cross-examination, if his agreement with Mr. Rose concerning the mining deal was made after he had already disposed of the diamonds, and in each instance, he said: ''I don't know.'' He also admitted that in 1921 he was convicted on a charge of forgery in the Circuit Court of Jasper County and sentenced to imprisonment in the penitentiary for a term of two years, but said he was paroled. Appellant. also said, on cross-examination, that he was forty-nine years old.

Appellant's wife testified that, several times during the summer of 1924, Mr. Rose came to her home in Joplin and inquired ''how things were going on'' in the mining deal, and she told him ''they were going on just fine;'' and that on one of these occasions Mr. Rose told her ''to write Mr. Adams and tell him that the deal was too good to give up; to go ahead.''

I. The first count of the amended information is vigorously attacked on two grounds, first, because it fails to sufficiently plead any offense; second, because it attempts to charge two separate offenses in a single count, and, therefore, violates the rule against duplicity. Omitting formal parts, the first count of the information is written as follows:

''Roy Coyne, Prosecuting Attorney, within and for the County of Jasper in the State of Missouri, upon his oath informs the court and charges that on or about the — day of May, 1924, in the County of Jasper and State ofMissouri,

''J. B. Adams, being then and there the agent of E. Rose, and the said J. B. Adams being then and there not a person under the age of sixteen years, did then and there by virtue of his said employment as agent of E. Rose, have, receive and take into his possession and under his care said property, to-wit:. A one-carat ladies' white gold diamond ring of the value of $265 and one pair of diamond ear-screws with white gold mounting each ear-screw being a carat diamond of the value of $450 of the property belonging to E. Rose and the said J. B. Adams, the said personal property then and there did feloniously embezzle and fraudulently convert to his own use without the assent of his said employer, the said E. Rose, the owner of the said property and the said J. B. Adams the said property feloniously did take, make way with and secrete with intent the said property fraudulently to embezzle and convert to his own use without the assent of the said E. Rose, his employer, and the said J. B. Adams the said gold diamond ring and the said diamond ear-screws in manner and form aforesaid did steal, take and carry away; and against the peace and dignity of the State.''

The offense of embezzlement by an agent, which is sought to be charged, is defined by Section 3327, Revised Statutes 1919, and all

essential elements of the offense are found in this statute. The offense is one of purely statutory origin. The first count of the information follows the language of the statute and covers all elements of offense as defined by the statute. It fairly advised appellant of the nature and cause of the accusation against him. This is sufficient. [State v. Julin, 292 Mo. 264, 235 S. W. 818; State v. McWilliams, 267 Mo. 437, 184 S. W. 96; State v. Moreaux, 254 Mo. 398, 162 S. W. 158.]

It is true, as now contended by counsel for appellant, that the first count of the information, in addition to pleading actual embezzlement, also pleads that appellant made away with and secreted the property in question with intent to embezzle the same. If this rendered the information defective, because of duplicity, appellant failed to take advantage of the defect until after the verdict against him. He filed no demurrer or motion to quash the amended information and met the State squarely on the issue of actual embezzlement on the proof tendered at the trial. In this situation, he cannot now complain on this ground, as the defect, if any, was cured by the verdict. [State v. Davis, 237 Mo. 237, 140 S. W. 902; State v. Nieuhaus, 217 Mo. 332, 117 S. W. 73.] It was not necessary for the State to plead the element of criminal intent in charging actual embezzlement, and appellant cannot justly complain of the action of the State in assuming this unnecessary burden. [State v. Larew, 191 Mo. 192, 89 S. W. 1031; State v. Lentz, 184 Mo. 223, 83 S. W. 970.] After verdict, surplusage and repugnant allegations will be disregarded, where the information is sufficient to indicate the crime and the person charged and the verdict is responsive to the charge. [Sec. 3908, R. S. 1919; State v. Lawler, 220 Mo. 26, 119 S. W. 639.]

II. Next, counsel for appellant earnestly contend that there is a failure of proof on the charge of actual embezzlement, and further, that there is a fatal variance between this charge and the proof tendered. In support of both of these contentions, counsel adopt the testimony of appellant as establishing the facts in the case and reach their conclusions accordingly.

There was evidence on both sides tending to show that appellant received the diamonds in question as the agent of Rose and that this relation between them existed at the time appellant had his dealings with Dr. Barson and Mr. Poole. Appellant knew that Rose handled these diamonds on consignment and that they were charged to Rose. His receipt for these diamonds covered other diamonds which he sold for Rose and accounted for. Rose testified that their agreement was the same as in the other transactions, that is, an equal division of profits over and above the wholesale or cost price. Rose demanded the return of these diamonds and appellant promised to return or account for the sale of the same. Appellant's appropri-

ation of these diamonds for his own use occurred before the time of his alleged partnership agreement with Rose in the mining deal. However, any evidence tending to show that such partnership agreement was made before appellant sold the diamonds, merely presented an issue of agency or partnership for the jury to decide. Appellant testified that he was forty-nine years old and thus supplied the necessary proof that he was over the age of sixteen years. But, in the absence of positive evidence on this element of the offense charged, the jury could have reasonably inferred that appellant was over sixteen years of age by observing him at the trial, from his letters and telegrams to Rose, and from other evidence in the case. These diamonds were sent to Rose as a broker, on consignment, and they were charged to him. This is sufficient proof of ownership, as against appellant. When appellant sold the ladies' ring to Mr. Poole on May 20, 1924, for $200 and pocketed the money for his own use, he committed an act of embezzlement, if he was Rose's agent at that time and did so without Rose's consent. He, likewise, committed embezzlement each time he pawned the ear-screws with Dr. Barson for money loans on June 10 and June 27, 1924, and again when he sold the ear-screws to Dr. Barson, on July 2, 1924, for $300, and applied the money to his own use, if at such times he was Rose's agent and did these things without Rose's consent. If these acts were committed under the circumstances indicated, no inquiry as to appellant's intent is necessary. The law measures his criminal intent by his acts. However, the undisputed evidence, that he sold both the ear-screws and the ladies' ring far below the wholesale or cost price, and then, by a long series of false statements and false promises, kept such sales as a secret from Rose until the time of his arrest, more than a year thereafter, proves, abundantly, appellant's felonious and fraudulent intent to convert these diamonds to his own use without Rose's consent and to permanently deprive Rose of the the same.

Counsel argue that the evidence shows appellant was acting in the capacity of a bailee and not that of an agent, and that the embezzlement, if any, was of the money realized from the sale of the diamonds and not of the diamonds, and that, for these reasons, there is a variance between the charge and the proof. Our views as to the case made by the State, above expressed, fully answer this argument.

It is our conclusion that there is, not only, ample evidence to support the verdict, but also, that the evidence is overwhelming on the size of the verdict. [State v. Julin, State v. McWilliams, State v. Moreaux, State v. Lentz, supra; State v. Gebhardt, 219 Mo. 708, 119 S. W. 350.] It follows that appellant's Instruction No. 1, in the nature of a demurrer to the evidence, was properly refused.

III. The general form of the verdict is assailed in appellant's brief, although no complaint is made on this ground in the motion for a new trial. The case being submitted to the jury on one charge only, under the first count of the information, the verdict, finding appellant "guilty of embezzlement, as charged in the information," is responsive and sufficient in form and substance. [State v. Julin, supra; State v. Bishop, 231 Mo. 411, 133 S. W. 33.]

IV. Another error assigned in the motion for a new trial relates to the refusal of the trial court to permit appellant's counsel to make a certain argument in his address to the jury. The motion quotes the argument referred to but the record before us fails to show either the argument tendered or the court's ruling on the same. Of course, assignments of error in a motion for a new trial do not prove themselves, and, consequently, this is not a proper question for our review. [State v. Baird, 297 Mo. 219, 248 S. W. 596; State v. Creeley, 254 Mo. 382, 162 S. W. 737.]

V. The errors assigned to the trial court as to rulings on the admission and exclusion of evidence and as to given and omitted instructions are general in character and do not specify "in detail and with particularity" any of the matters complained of. Such assignments do not present proper subjects for our consideration. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856.]

Finding no error in the record, we affirm the judgment. *Higbee* and *Davis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.