The State v. Eugene Copeland, *alias* Ward Berry, *alias* Barney Ward, Appellant.—71 S. W. (2d) 746.

Division Two, May 17, 1934.

*De Witte T. Lawson* for appellant.

*Roy McKittrick*, Attorney-General, and *Covell R. Hewitt*, Assistant Attorney-General, for respondent.

LEEDY, J.—This case comes to us on appeal from the Circuit Court of the City of St. Louis where, at the June, 1932, term thereof, appellant was convicted of murder in the first degree, and the extreme penalty provided by law for that offense was assessed by the jury. Timely steps for review were taken, including an order permitting defendant to prosecute his appeal as a poor person at the expense of the State. It should be stated that counsel representing appellant in this court did not appear for him in the court below.

One of the assignments may be treated as challenging the sufficiency of the evidence, but otherwise the scope of our review of the matters

142

complained of has been quite narrowly limited by the motion for new trial. We shall, therefore, set forth in some detail the facts of the case as disclosed by the 400-page record before us. Appellant, whose full name, as he testified, is Barney Eugene Copeland Ward, is a colored man, thirty-three years of age, a native of Tennessee, and who removed to St. Louis in 1916. The charge grew out of a holdup and robbery of the Avenue Furniture Company, 1107-1109 Franklin Avenue, in the city of St. Louis on Monday, June 1, 1931, wherein Jack Davis, one of the sons of the proprietor of that business, was killed.

The Avenue Furniture Company is located on the north side of Franklin Avenue between Eleventh and Twelfth Streets. The building extends between fifty and sixty feet east and west on Franklin, and, as was variously estimated, from eighty-five to one hundred and ten feet deep, north and south. There is a solid partition running north and south through the center of the store, dividing the space into what was called the east room or store, and the west room or store, each having approximately the same area. These rooms or stores were connected by means of two openings, each eight feet in length, referred to in the testimony as archways. One of the archways was near the front, or Franklin Avenue, entrance, and the other toward the rear of the building. An office which was described by the witnesses as resembling a "teller's cage" is located in the east room and in close proximity to the rear archway. It was built of composition board or wood, and was about nine feet high at the rear and was open in front. There is a stairway leading to the basement from the west storeroom, and the doorway thereto is on the west wall of that room, and some distance north of the south or front line of the building.

Jack Davis unlocked the front door, and opened up the store for business at eight o'clock, A. M., on the day mentioned, accompanied by Ernest Thomas, a colored boy, who was employed there as a porter and who also "helped on the truck." According to the testimony of Thomas, they entered the east storeroom, and Davis went back to the office, but he (Thomas) stopped at the front archway connecting the two storerooms where there was a radio, which he turned on. While engaged in that operation, his back was to the front door, and he was facing the back of the store. When stooping over the radio "Somebody put a gun in my back," as he expressed it, and told him to "Stick them up." When he started to comply with that direction, one of the voices said, "Put them down; somebody might be on the outside and see them and know something was going on." He then attempted to look up over his shoulder, and was told not to look around. When he straightened up, he was asked where his boss was, and he said "He is around here some place." He was then ordered

"To get on back there," and was walked north down an aisle of furniture to the rear of the store, beyond the office, where he was caused to lie down on the floor, face down, behind an ice box. Thomas testified that after he had passed the office, he heard a voice say, "Hello, Jack" and that the deceased, Jack Davis, replied, "Hello, boy." At that time another voice said, "I came after you," and commanded Davis to "Open the safe." Davis said, "It's already open." Thomas then heard them moving around in the office, and a voice saying, "Don't you step on nothing." To which the reply was, "I am not trying to step on nothing." Thomas was unable to say definitely how many robbers there were, and he did not know whether "the people who were talking to him" were black or white "only by voice; it sounded like colored people." Just after the conversation last related, Thomas, who was prone on the floor in the back of the store, under guard, heard the front door slam. A second after the front door was heard to slam, he heard a voice say, "Old man, you get over in the bunch." Then he heard "a lick pass" and someone walked toward the office. By that time Thomas was told to get up off of the floor. It is appropriate to say at this time that the person who slammed the door was a plain clothes officer, Captain William Tierney, who was in charge of the Ninth Police District, and who had come to the store for the purpose of arresting one Frank Sadler, a colored man employed there as chauffeur. He was wanted in connection with another robbery case. Thomas, Davis and Captain Tierney were lined up, and ordered to march to the basement. Thomas led the procession, followed next by Davis, and then by Captain Tierney. The robbers remained behind the line of march, and could not be seen by Thomas. They proceeded from the rear archway west through such archway into the west storeroom, thence south down an aisle of furniture toward a door leading to the basement. Thomas had reached that door, and turned on the light in the basement when he heard a noise "like somebody scuffling, and moving furniture around" behind him. He turned around, and found Jack Davis standing beside him. The scuffling noise came "from the back, about middleways of the store," but at that time Thomas did not see anyone back there in the aisle. Whereupon, Jack Davis turned or whirled around and ran back to where the scuffling was in progress. Thomas testified that a shot was then fired, and that Davis "made a jump, and jumped behind a chifforobe" with his two arms extended in front of him, but at that time he (Thomas) could not see either the robbers or Captain Tierney. Thomas himself stooped down behind a chifforobe, and he was then about four feet from the basement door, where he remained "until things got quiet." Thomas further testified that after hearing the shot fired, he heard "about four more shots after that," and that "about a second after the shooting" he

saw a man clad in overalls run out of the front door, whom he identified as a colored man, named James Sanford, known as "Baby Boy." Thomas then "turned on the light to see what happened," and went back to where he had heard the scuffling, and heard somebody breathing. He moved some furniture, and found Jack Davis crouched alongside a chifforobe against the east wall of the west storeroom, with his head on his breast, unconscious. He then went to the office, and attempted to telephone the father of the deceased, but was unsuccessful in so doing. While in the office on that mission, he noticed "all the papers and receipts and things were thrown over the floor; the money box was on the floor."

Captain Tierney died March 4, 1932, and before the trial of the case, but it was shown by the police officers who accompanied him to the Franklin Avenue address that he and other officers went there for the purpose of arresting Frank Sadler; that they arrived at the store at about 7:50 A. M., and before Davis and Thomas made their appearance; that Captain Tierney stationed Officer Shoulders across the street from the store, and stationed Officer Pugh near the garage which was in the alley running along the west side of the store. While so stationed, and during the time Captain Tierney was down the alley with Officer Pugh, Officer Shoulders arrested a colored man who was loitering about the mouth of the alley, but across the street from the store on the south side of Franklin Avenue. It was shown that Captain Tierney entered the front door of the furniture store and in the meanwhile Officer Shoulders questioned the man whom he had placed under arrest. Officer Shoulders testified that the next thing he noticed after Captain Tierney entered the store was when his attention was called to the captain "standing in the front door of this furniture store with his revolver in his hand and hollering as loud as he could." He testified that when Captain Tierney said, "Hey!" he "noticed a colored man in blue overalls and blue jumper or shirt on, run into this alley." Officer Shoulders then, at the direction of Captain Tierney, turned his man over to the latter, and pursued the fleeing colored man who proved to be James Sanford, the man Thomas had seen leaving the store. After a brief but very exciting chase, in which numerous shots were exchanged between Sanford and the officers, whose forces in the meanwhile had been augmented by three other policemen stationed on Wash Street for the purpose of assisting in the apprehension of Sadler, Sanford was shot and killed in the alley, a short distance north of Wash Street, which he had crossed in his flight. This encounter, as stated, was participated in by the five policemen and Sanford. The revolver Sanford had was a .38 caliber Smith & Wesson, 6-inch barrel. It was recovered from his clutched hand after he had been shot and killed, and was found to contain five discharged shells and one loaded shell. On Sanford's

person there was found a black leather billfold containing several Masonic Lodge membership cards bearing the name of Jack Davis. three one dollar bills, and five checks of various denominations totaling $82.28. There was also found on the ground where he was lying a one dollar bill, two cartridges. and a nickel that rolled out of his pocket. The checks, a watch and billfold were later delivered by the police to Max Davis, a brother of deceased. The checks had been endorsed by the several payees, and were cleared through usual banking channels. It was shown that the regulation service revolver of all police officers in St. Louis is known as a ''.38 special.'' Revolvers of that type and caliber were the only ones carried by them on the day in question. Nevertheless, a slug or bullet out of a .45 caliber cartridge was dug out of the floor of the east storeroom by Officer McCormick on June 6th. It was found to have gone through the flooring, and imbedded itself in the cross-joist underneath. The point at which it was found was between thirty and thirty-five feet from the front entrance, and about three feet east of the partition. The so-called office was fifteen or twenty feet north of that place. The officer testified on cross-examination that, in his opinion, the bullet was fired at a distance of about fifteen feet, and from its course as indicated in the floor, it was fired from the south, and on a direct line with ·the office. It was further shown that a bullet of that caliber could not have been fired from a .38 revolver.

The officers made a complete but unavailing search of the premises after the holdup. Appellant was not found therein, nor was he seen to leave the store. The colored man who was arrested by Officer Shoulders gave his name as Elias Hawkins. but he was not held. Sadler was not found by the police, nor has he since been apprehended.

Davis was removed to City Hospital No. 1, where he died without regaining consciousness. A post-mortem examination revealed that his death was caused by a gunshot wound in the head, the bullet entering the right forehead and made its exit at the angle of the left jaw. There was a powder burn approximately one-half inch in diameter around the wound, indicating that the gun was fired at close range. Appellant was not arrested until three months later, and then not directly in connection with this offense. He was apprehended about six o'clock on the morning of August 29, 1931, and taken to the Eighth District Police Station which was in charge of Captain Albert Wetzel. Between five and six o'clock in the afternoon of that day, and after being questioned about another robbery, and finally about the Avenue Furniture Company holdup, and after the police ascertained that there was a ''hold'' order for appellant from the Ninth District, Captain Tierney of the latter district went to the station where appellant was held, and he was brought into Captain Wetzel's office.

Captain Wetzel testified to the following: That he asked appellant if he knew the man (Captain Tierney, who was attired in civilian clothes), and appellant said, "Yes, he was the man he had met, that came in the furniture store the day it was held up." Captain Tierney then shook his finger at him and said, "Yes, you are the one who was in there." Appellant then said, "Yes, you struck me right here, you struck me on the side of the head." He said that they had scuffled and Tierney fired a shot, and he fired one, and snapped the trigger twice but it did not go off, and he broke and ran out of the store. He then related that sometime after seven o'clock on the morning of June 1st, on Washington Avenue, he met Frank Sadler and a colored man called "Baby Boy;" that Sadler and appellant had previously discussed holding up the furniture store; that the three of them walked down to the store, and when they started in Sadler stopped, and did not go any farther, but he and "Baby Boy" went in and committed the holdup, got the money, and "were about to start out when another white man came in who later turned out to be Captain Tierney." He said when "Captain Tierney came in and 'Baby Boy' brought him back to where he was, the scuffle started. He tried to get by them, to pass them, and the scuffle started." He said the pistol he had was given to him by Sadler, and was what he described as a "thirty-two-twenty" (32-20); that he ran out of the store, detailing the course of his flight; that he threw the pistol away in the railroad yards near Twenty-second Street; that from the railroad yards he went to his home, and stayed there two days, then left and went to Henderson, Kentucky, thence to Cincinnati, and returned to St. Louis about seven days before his arrest. He denied firing the shot that killed Davis.

Max Davis, a brother of the deceased, testified that he saw appellant at the police station a little after ten o'clock on Sunday, the day after he was placed under arrest; that at that time he recounted the facts relating to the holdup and his participation therein substantially as testified to by Captain Wetzel. The same confession, at least, in its more important details, was repeated by appellant at the police station to Sam Weber, a brother-in-law of deceased, in the presence of Max Davis, and the latter's father. The father of deceased did not testify in the case. Sergeant Charles Rowland was called on the part of the State, and he testified to being present at the police station between nine and ten o'clock on the evening appellant was arrested, when his confession was reduced to writing and signed by appellant in the presence of witnesses. His written confession embraces the same matters related in his several oral confessions, but in more detail. It was introduced in evidence without objection. Likewise no objection was interposed to the testimony of the witnesses Captain Wetzel, Max Davis, Sam Weber and Sergeant Rowland, touching appellant's oral confessions.

. The defense was an alibi, the material facts of which were supported by the testimony of the following witnesses: The defendant himself; his niece, Grace Johnson; his sister, Emma Ward, and her intimate friend, a colored woman, named Irene Carson. His alibi rested on the following facts, as testified to by those witnesses: That on the day before the holdup and homicide, Emma Ward made an arrangement with Irene Carson whereby appellant was to repair Irene Carson's radio at her home, 3894A Windsor Place; that pursuant to that arrangement, which had been communicated to appellant, he left the home of his sister, Emma Ward, where he made his home, at ''about fifteen or twenty minutes of seven'' on the morning in question, and walked to 807 North Jefferson, where he borrowed a dollar from Ben Thomas, the proprietor of a smoke shop at that address at ''about ten minutes to seven;'' that on the street in front of, or near the smoke shop, he met his niece, Grace Johnson (presumably a daughter of Emma Ward), who was riding with her husband, Dave, an ice peddler, on his ice truck; that appellant got on the truck, and rode with his niece and her husband to Morgan and Leffingwell, where at 7:15 o'clock the niece left them, and appellant and Dave Johnson proceeded on to the Irene Carson home, arriving at ''about ten or fifteen minutes to eight,'' where Copeland remained in repairing the radio until noon of that day. Ben Thomas, the proprietor of the smoke house referred to, was called on the part of defendant, but he merely fixed the hour as 6:50 A. M., on the date in question when appellant was in his place of business and borrowed a dollar. It may be observed that Dave Johnson, the alleged driver of the ice truck, was not called as a witness.

Appellant denied making the several admissions attributed to him on the four different occasions detailed, respectively, by Captain Wetzel, Max Davis, Sam Weber and Sergeant Rowland, and with respect to the written confession he testified it was not read over to him, and that he signed it for the purpose of effecting the release of his mother, sister and ''all his folks'' who, as represented to him by the police, were being detained in jail, and would be sent to the workhouse or penitentiary if he did not confess. He also testified that the police threatened to ''take him out on Olive Street Road.'' On the other hand, the police officers testified that no such arrests had been made, nor were they threatened; that the confessions were made voluntarily, and without any threats or promises of immunity; that the purpose of his being taken to the hospital after he confessed was that he might be examined by competent medical skill, and the fact established that his body bore no evidences of maltreatment. However, in that connection it may be said there was no suggestion made by appellant that he had been ''manhandled,'' or caused to suffer any bodily injuries at the hands of the police, and, as stated, his confes-

sions were received in evidence without any objection whatever on his part. He denied having been out of the city between June 1st and the date of his arrest. On cross-examination he admitted having served a term in the Chicago House of Correction on a charge of larceny, as well as having been convicted of first degree robbery, and sentenced to a term of three to twenty years, which he served at the Joliet (Illinois) Penitentiary from 1926 to 1930. Other pertinent facts, if any, will be stated in the course of the opinion.

I. The motion for new trial contains in separately numbered paragraphs, ten assignments, or grounds on which a new trial is asked. Paragraphs one to seven, both inclusive, are, respectively, as follows:

"1st. Because the verdict of the jury is against the evidence, the greater weight of the evidence and the law.

"2nd. Because the verdict of the jury is against the instructions of the court and the greater weight of the evidence.

"3rd. Because the verdict of the jury is the result of passion and prejudice on the part of the jury.

"4th. Because the court failed to instruct the jury in all the law arising in the case under the evidence.

"5th. Because the instructions of the court are misleading and does not properly declare the law.

"6th. Because the court erred in admitting illegal and incompetent testimony offered on the part of the State over the timely objections of the defendant.

"7th. Because the court erred in rejecting legal and competent testimony offered on the part of the defendant."

It will be noticed that the assignments set out above are general in character, and wholly lacking in that degree of particularity required by the statute (Sec. 3735, R. S. 1929; Sec. 3735, Mo. St. Ann., p. 3275) respecting the matters complained of. Assignments in terms identically (or practically so) like those above enumerated have been held insufficient to preserve anything for review. [See State v. Anno, 296 S. W. 825, l. c. 827; State v. Williams, 292 S. W. 19, l. c. 20; State v. Carroll, 333 Mo. 558, 62 S. W. (2d) 863, l. c. 867; State v. Francis, 330 Mo. 1205, 52 S. W. (2d) 552; Sec. 3735, supra; State v. Standifer, 316 Mo. 49, 289 S. W. 856, l. c. 857; State v. Tippett, 317 Mo. 319, 296 S. W. 132, l. c. 135; State v. Burrell, 298 Mo. 672, l. c. 678, 252 S. W. 709; State v. Simon, 317 Mo. 336, 295 S. W. 1076, l. c. 1080; State v. Fannin, 296 S. W. 84, l. c. 85; State v. Adams, 318 Mo. 712, l. c. 723, 300 S. W. 738, 743; State v. Miller, 17 S. W. 353, l. c. 356; State v. Jetts, 318 Mo. 672, 300 S. W. 752; State v. Moore, 36 S. W. (2d) 928.]

II. The preceding paragraph disposes of all but three of the grounds assigned in the motion. We now proceed to a consideration

of the tenth assignment, which we are treating as challenging the sufficiency of the evidence. Having reviewed the evidence in some detail we think a mere perusal thereof would seem to answer any question with respect to its sufficiency. The fact that Jack Davis lost his life in the holdup and robbery in question is not controverted. It is quite true no eyewitness took the stand who identified appellant as being present at the time and place of the homicide, or that he was seen going in or leaving the premises at or about that time, but direct evidence of that character is not required to establish either guilt or identity. Proof that deceased came to his death under the circumstances detailed in evidence, sufficiently established the *corpus delicti*, and made admissible the voluntary extrajudicial confession of the defendant. Clearly this made a case for the jury. The credibility of the witnesses and the weight and value to be given their testimony were matters peculiarly within the province of the jury, and for its determination. The jurors saw fit, as they had the undoubted right to do, to believe the witnesses for the State and found defendant guilty. The trial court alone is empowered to set aside a verdict on the ground that it is against the weight of the evidence. We think it cannot fairly be said that there is no substantial evidence to support the verdict, and hold it is not open to the charge leveled against it, and overrule appellant's contention in that regard.

III. Complaint is made concerning the matter of a letter purporting to have been written by Frank Sadler to Max Davis, as well as alleged improper argument of the assistant circuit attorney in referring to the same. As the Assistant Attorney-General points out in his brief, the motion refers to the letter as having been received from Sanford, instead of Sadler. It is apparent that such is a clerical error, and we, like the Assistant Attorney-General, think it ought to be so treated. It is covered by the eighth ground of the motion, as follows:

"8th. Because the Assistant Circuit Attorney, Mr. Flynn, was guilty of misconduct in attempting to introduce a letter from Mr. Sanford purported to have been received by a brother of the deceased when the testimony shows that the writer of the letter was an employee of the deceased and a party to the murder, and was further guilty of misconduct in referring to the letter in his closing argument to the jury; that notwithstanding the Court sustained the objection and instructed the jury to disregard the statement of Mr. Flynn, that could not blot it out of their minds and was prejudicial."

Max Davis testified, without objection, that about ten days after the holdup he received a letter from Frank Sadler, saying he was in Crystal City, Missouri. The letter was turned over by Davis to a detective at police headquarters. We have searched the record and find the matter complained of in the first part of the eighth as-

signment grows out of the following which occurred on the re-direct examination of the witness Max Davis:

"Q. Mr. Williams asked you if you went to the police station and viewed the defendant Copeland whether or not you had ever seen him before or had heard of him before and you answered no? A. Well, I had heard of him in the letter, but I had never seen the man before.

"Q. When was the first time you heard of Copeland? A. About ten days after my brother got murdered.

"Q. Was that in the form of a letter? A. Yes, sir.

"Q. Whom was that letter from? A. Frank Sadler.

"MR. WILLIAMS: I object to that and ask that it be stricken out and the jury instructed to disregard it.

"THE COURT: Objection sustained. Strike it out and the jury is instructed to disregard it.

"MR. FLYNN: That is all.

"MR. WILLIAMS: That is all."

It will be observed that the matter was stricken from the record, and the jury was, by proper direction of the court, instructed to disregard it. The court did all it was requested to do in the premises, and appellant's counsel apparently was satisfied with the action of the court because no exception was saved, nor was it moved that the jury be discharged. There is nothing in the record to indicate what argument, if any, the assistant circuit attorney made with reference to the matter. In that state of the record, and in the absence of an exception saved at the time, there is nothing for this court to review.

IV. Appellant complains that the punishment is excessive. The point is not developed in the brief and argument further than as reflected by the following statement in the concluding paragraph: "Counsel represents to this honorable court that the punishment is excessive; that the evidence did not warrant a conviction and assessment of the death penalty." It is provided by Section 3982, Revised Statutes 1929 (Sec. 3982, Mo. St. Ann., p. 2778) "Every homicide which shall be committed in the perpetration or attempt to perpetrate any . . . robbery . . . shall be deemed murder in the first degree." It has been held that proof that the killing so occurred is admissible under an indictment or information in the usual and common form, as in the case at bar. [State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; State v. Meyers, 99 Mo. 107, 12 S. W. 516; State v. Brown, 119 Mo. 527, 24 S. W. 1027, 25 S. W. 200; State v. Foster, 136 Mo. 653, 38 S. W. 721; State v. Peak, 292 Mo. 249, 237 S. W. 466; State v. Adams, 316 Mo. 157, 289 S. W. 948.] Also proof that defendant and others conspired together to commit an unlawful act, and that the killing occurred while carrying out the conspiracy may

be shown under such an indictment. [State v. Nasello, supra; State v. Carroll, 288 Mo. 392, 232 S. W. 699; State v. Parr, 296 Mo. 406, 246 S. W. 903.] The applicable section of our statute fixing the punishment for murder in the first degree (Sec. 3984, R. S. 1929, sec. 3984, Mo. St. Ann., p. 2788) says: "Persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment in the penitentiary during their natural lives." The case was submitted under instructions authorizing either of two verdicts: one convicting appellant of murder in the first degree, and the other acquitting him. This court has repeatedly held that the fixing of the punishment for crime is a legislative and not a judicial function, and when, as in this case, the punishment is assessed within the limits prescribed by statute it cannot be adjudged to be excessive. [State v. Preslar, 318 Mo. 679, 300 S. W. 687; State v. Alexander, 315 Mo. 199, 285 S. W. 984.] Adherence to such holdings, obviously sound, disposes of the question thus raised, and so the point is ruled against appellant.

V. In compliance with our duty under the statute, we have examined the record proper with a view of ascertaining whether reversible error appears therein. We find the information is sufficient in both form and substance; the verdict and judgment are likewise regular and sufficient. The record discloses no procedural errors. Virtually every objection made on behalf of appellant was sustained by the trial court, and few were interposed by the State as defendant's case was unfolded. In its last analysis, the record merely presents questions of fact on conflicting evidence. The evidence in the case, when taken as a whole, fully warranted the jury in returning the verdict it reached. There has been nothing presented on appeal which would justify our interfering with the execution of the sentence. The judgment is, accordingly, affirmed.

Date of execution set for Friday, June 29, 1934. *Tipton, J.,* concurs; *Ellison, P. J.,* absent.