THE STATE v. RAY BOYER, *alias* RAYMOND BOYER, Appellant.—112 S. W. (2d) 575.

Division Two, January 26, 1938.

*Roy McKittrick*, Attorney General, *Olliver W. Nolen* and *Arthur O'Keefe* for respondent.

COOLEY, C.—In the Circuit Court of Jackson County defendant, appellant, was convicted of murder in the first degree for the killing of W. Dale Sandford, sentenced to death and has appealed. He was represented below by counsel appointed for him by the court but has filed no brief in this court. We must, therefore, look to the motion for new trial for the grounds on which reversal is sought.

The State's evidence tends to show the following:

The deceased, W. Dale Sandford, who was about thirty years of age, lived with his mother in Kansas City, Kansas. He belonged to a military organization, referred to as the Reserve Officers' Training Association, and on the evening of April 9, 1936, attended a meeting of the association, having with him a twenty-two pistol for use in target practice. He left the hall in which the meeting was held about nine-thirty P. M. and from then till about midnight was at various places in Kansas City, Kansas, with friends. His movements during this interval are here unimportant. About midnight he went over, apparently alone, to Kansas City, Missouri, where he met the defendant Boyer. It seems they had not met before. The occasion and the details of this meeting as well as, to a large extent, the subsequent movements of the two, are gleaned from a written confession made by Boyer after his arrest and which was introduced in evidence. According to this confession defendant, by chance, met deceased at or near the entrance of a "beer place," accosted him and asked him if he wanted a drink, to which deceased replied that he was not much of a drinker but would take one or two, and did, defendant furnishing the liquor from a bottle he had with him. In this connection, to keep the chronology clear, defendant, after his arrest, told an officer that on the evening of April 9th, before meeting Sandford, he had determined to rob someone, being out of funds, and had armed himself for that purpose; that he saw Sandford drive up to the restaurant,—"beer place,"—observed that Sandford was well dressed and had a new car, and accosted Sandford when the latter came out of the restaurant, and when they got in the car "put a pistol on him;" that he thought, from Sandford's appearance and his having a good automobile, that he had money; that Sandford then told him his name. Pursuing now the written confession: Defendant said that after taking a drink or two Sandford suggested that they should not stand on the street and to get into his—Sandford's—car; that they did so and drove around for about an hour; that he told Sandford he was out of work and wanted to go to St. Louis and Sandford said he was only working part time and would go with him. They then started toward St. Louis, on Highway No. 40. He then described

how they stopped at one or two places and tried, unsuccessfully, to get checks cashed, the last of such places, before the homicide, being a place called Ideal Camp. We quote from the confession at this point:

"Right after coming out of Ideal Camp Sandford said, 'Maybe we had better go back to Kansas City.' But I said, 'No, we are going on.' We continued to argue about whether we were going back to the city or on to St. Louis till we got to a spot on 40 highway just east of Oak Grove, Missouri, and where there were no houses near. After Sandford stopped the car saying 'I am going to turn around and go back,' I pulled a 32 U. S. Revolver that I had, and which was fully loaded, forcing Sandford out of the car and making him take off his coat and vest which I threw back into the automobile. I then forced him to walk off the road into a field a distance and told him to take off his tie as I was going to use it to tie him up, it was my intention at this time to take the car and to go on to St. Louis. When I asked him to take off his tie he pulled his hand out of his pants pocket and pulled out what it looked to me to be a revolver. I then fired three shots, shooting him three times and he fell to the ground. The revolver I used to kill Sandford I obtained in Washington, D. C. I have been shown a revolver in the office of Thomas B. Bash, Sheriff of Jackson County, Missouri, which I identify as the revolver used by me in the killing of Sandford. After Sandford had dropped to the ground I took his pants off and picked up his gun leaving him in the field and went back to the automobile where I removed from his clothes his billfold and checkbook and other papers and then got in the car and continued to drive east. . . ."

Defendant in his confession then told in detail how he proceeded to St. Louis, stopping at several places and attempting to cash checks to which he forged Sandford's name, passing himself off as Sandford and using cards and papers he had taken from deceased to identify himself as Sandford. At two places he thus succeeded in cashing checks, one for $2 and one for $5, and at another place he left the suit of clothes he had taken from Sandford as security for a tank full of gasoline which he there purchased, promising to return and "redeem" the clothes. He reached St. Louis in the forenoon of April 10th where, soon after his arrival, he was arrested by police officers, the murder having been discovered that morning and news thereof broadcasted. Deceased's pistol, watch, pocketknife, billfold, checkbook and various identification cards and papers were in defendant's possession when arrested, as well as deceased's automobile. He at first denied his guilt. He was taken back to Kansas City the same day and on the way was confronted with and identified by several people at places where he had stopped after the homicide and at the places where he and Sandford had stopped. Persons at places

where he and Sandford had stopped also identified Sandford from a photograph introduced in evidence. Defendant's confession was made soon after his return to Kansas City. That it was voluntary and properly admitted in evidence was sufficiently shown. The motion for new trial does not complain of its admission so the evidence showing its admissibility need not be detailed.

Sandford's dead body was found early in the morning of April 10th in a field adjacent to Highway No. 40 and about a hundred or a hundred and twenty-five feet from the highway. He had been shot three times in the head. From the nature of the wounds death must have been instantaneous. Powder marks on his sleeve indicated that he may have thrown up his arm just before the fatal shot as though in an instinctive effort to protect himself. His coat, vest and trousers had been removed.

Defendant's confession was, as we have indicated, a detailed and rather lengthy statement. As to facts therein stated relative to the places where he and Sandford had stopped prior to the homicide, and places where defendant had stopped thereafter enroute to St. Louis, and his actions, etc., at such places, as well as after arriving at St. Louis, his possession of deceased's property and effects, his passing himself off as Sandford,—in short all the facts and circumstances except when the two men were alone together,—were shown by evidence other than the confession substantially as stated in that instrument. The facts and circumstances proved, without the confession, would alone be sufficient to sustain a verdict of guilty. In fact there seems to be no serious contention that defendant did not kill the deceased. He did not testify at the trial and offered no evidence. Aside from some contentions of a more or less technical nature, which we shall discuss, defendant's effort at the trial, as indicated by his counsel's argument to the jury, seems to have been directed to an attempt to procure a sentence of life imprisonment instead of the death penalty which the State was asking. We deem it unnecessary to make a more detailed statement of the facts. Such further reference to the facts as may seem necessary will be made in connection with particular points to be considered.

Appellant's first point in his motion for new trial is "that the court erred in overruling defendant's motion to quash the jury panel and the challenge to the array in said cause." No reason is assigned. The motion is long, covering six typewritten pages of the transcript. It does not challenge the personal fitness of the men drawn for jury service nor the fact that their names were drawn from a jury wheel or box as provided by Sections 8797 and 8798, Revised Statutes 1929 (Mo. Stat. Ann., p. 4715). It goes rather to the manner in which the jury commissioners had performed their duties in keeping the jury list revised. Defendant's motion seems to concede,—at least it in-

dicates,—that there were over 43,000 names of men qualified to act as jurors in the jury wheel. Some of those whose names had originally been placed in the wheel had died or moved away, others could not be located, and others had been disqualified. Those names had been removed from the wheel. Many names of jurors who had served during the preceding three months prior to the regular quarterly meetings of the board of jury commissioners would be, at each or most of such meetings, ordered held out of the jury wheel for a period of one year,—this no doubt, pursuant to a provision contained in Section 8803, Revised Statutes 1929 (Mo. Stat. Ann., p. 4716), that no person shall be permitted to serve as a juror who has served on a regular panel within one year last past. There is nothing to indicate that such names were not returned to the wheel after the lapse of one year. The above facts appear from defendant's evidence on this motion, covering some 122 pages of the transcript and consisting of the records of the meetings (held quarterly) of the board of jury commissioners. Further, as shown by such records, additional names were added from time to time.

We shall not further discuss or elaborate on this question because it is not properly here for review. We have mentioned the facts relative to this assignment briefly and generally, only because of the gravity of the case, the death penalty having been assessed, and to indicate that in our opinion defendant suffered no prejudice in this matter. In State v. Layton, 332 Mo. 216, 58 S. W. (2d) 454, and again in State v. Hall, 102 S. W. (2d) 878, we held assignments in a motion for new trial similar to that above quoted too general and vague, under the statute, to present anything for review.

In his motion for new trial defendant assigned as error that the court erred in overruling his motion to quash the information and "in overruling defendant's objection to the introduction of any testimony in said cause." No reason is stated as to either assignment. Both are general and indefinite. But the information is part of the record proper which it is our statutory duty to examine for error, if any, appearing on the face thereof, whether assigned or not. [See State v. Harris, 337 Mo. 1052, 87 S. W. (2d) 1026, 1028 (5).] We have examined the information. It is in form such as has been many times approved by this court. No useful purpose could be served by setting it out herein. It is sufficient. The objection to the introduction of testimony was based upon the ground, generally stated, that the information does not state facts sufficient to charge a crime. It does sufficiently charge murder in the first degree. The objection to the introduction of any testimony was properly overruled. By thus disposing of this assignment of error we do not mean to be understood as holding that said assignment in the motion for new trial is sufficiently specific.

■ It is charged that the court erred "in sustaining the State's objection to the interrogation by defendant's counsel of the witness Joy Calleaux." In addition to being too vague and indefinite that assignment must be ruled against defendant because the record does not show that any witness of that name testified.

■ The fifth assignment in the motion for new trial is:

"That the court erred in asking and permitting the State's counsel to ask the jury if they were chosen as jurors in this case, and eleven of the jurors would vote for the death penalty, would he still hold out for a life sentence, regardless of how the other jurors voted, implying to the panel that it was their duty, if eleven of the jurors voted for the death penalty, to also vote for the death penalty."

On the *voir dire* examination of the prospective jurors counsel for the State indicated that he would ask the death penalty and asked if any of them had conscientious scruples against inflicting such penalty. Several indicated they had. Those men were then further questioned individually on that subject. Defendant's above-quoted fifth assignment seems to have reference to certain questions propounded by the court in such examination. The court asked one of said men, a Mr. Springer:

"If you were sitting in a capital case and the other eleven men were to agree on the penalty of death are your convictions such as would cause you to refuse to concur in that verdict solely on account of your convictions and independent of the consideration of the evidence?"

Defendant's counsel made the following objection ("exception" as he termed it), which was overruled:

"We except to the question as asked by the court and ask at this time that the panel be discharged for the reason that this question infers to this jury if selected that if eleven of them believe this man guilty and should be hanged, it would be the duty of the eleven to vote a verdict of guilty and the death penalty in this case, and for that reason the defendant excepts."

Mr. Springer said he did not believe in the death penalty and would feel that he was guilty himself if he voted to inflict it. He was excused. Similar questions were asked of one or two other prospective jurors, who also were excused because of their conscientious scruples against infliction of the death penalty.

Defendant's objection to the court's question, as above set out, is not very clear. Even if, as indicated in a subsequent objection, he meant that the question implied that if eleven voted for the death penalty it would be the duty of the twelfth, despite his conscientious scruples, so to vote because the other eleven so voted, we do not think the question carried or suggested any such implication. The statute fixes the punishment for first-degree murder at either death or life

imprisonment. The State had the right to a jury composed of men who would not be precluded by their conscientious scruples from inflicting whichever punishment the facts called for, and had the right to inquire about that matter. We see no merit in this assignment.

█ The next assignment is that the court erred in permitting deceased's mother, Mrs. Sandford, to testify "after the defendant's counsel had agreed to submit in evidence as an admission as against the defendant any facts that she might testify to, for the reason that the presence of the mother of the deceased on the stand was only for the purpose of prejudicing and inflaming the jury."

When Mrs. Sandford was called to the witness stand defendant objected to her testifying. Out of the hearing of the jury there was considerable colloquy between counsel. Defendant's counsel offered to admit that Mrs. Sandford *would testify* to whatever fact the State "says she would give," and that the only other purpose she could serve would be to prejudice the jury out of sympathy for her. State's counsel insisted that she was a very material witness, being, among other things, the only witness who could testify to deceased's actions just before going to the Reserve Officers' Association meeting, and the only witness who could definitely identify the clothes and other things we have above mentioned, found in defendant's possession after the homicide, as Sandford's property. It is too obvious to require discussion that such evidence, especially as to the identity of the clothing and effects of deceased, was material and important. During the course of Mrs. Sandford's examination, when the various articles were submitted to her for identification, defendant admitted that they had belonged to the deceased. But when Mrs. Sandford was called to the stand and defendant objected to her testifying, such identification had not been fully made, and note that defendant did not offer to admit, as a binding fact, whatever Mrs. Sandford might testify to,—vague and indefinite though that offer was,—but only that she *would testify* to whatever the State's counsel might say she would testify to. That would still leave for the jury the determination of the weight and credibility of her testimony, assuming that she would give such testimony as the State might indicate. It is too well known to require discussion that the personal appearance and demeanor of a witness before the jury has a bearing in enabling that body properly to estimate the worth of the testimony of such witness. For this reason we deem it unnecessary to consider the authorities cited by respondent which, it is claimed, hold that, even if the *facts* had been admitted "a party is not required to accept a judicial admission of his adversary, but may insist on proving the fact." [22 C. J., p. 330, sec. 370.] In this case the *facts* were not admitted,—

72

only that Mrs. Sandford *would testify* to whatever facts the State's counsel might claim she would testify to.

In this connection it may not be out of place to state that the record does not disclose that Mrs. Sandford at any time while on the stand or before the jury gave way to emotion or conducted herself in a manner calculated or that might be reasonably likely to work unduly upon the sympathy of the jurors or to inflame passion or prejudice on their part. The point is ruled against appellant.

■ It is asserted "that the court erred in admitting the testimony of Paul Long as to the post-mortem examination." The record does not show that Paul Long testified as to the post-mortem examination. He was a surveyor and testified only as to facts tending to show the venue. Moreover, that assignment is too indefinite to present anything for review.

■ Another assignment is that the court erred in "not giving defendant's peremptory instruction at the close of all the testimony." This contention is clearly untenable. There was ample evidence to warrant submission of the case to the jury and to sustain the verdict.

■ Assignment No. 9 is "that the court erred in giving Instruction No. 1." No reason is stated. Assignments 10, 11 and 12 are exactly like No. 9, except referring to other instructions. That these assignments of error in a motion for new trial are too general and indefinite to preserve anything for review has been too often decided by this court since the enactment of Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., p. 3275), to require discussion or citation of authorities. [See note to said section in Mo. Stat. Ann., supra, l. c. p. 3281.] For the same reason Assignment No. 13, "that the court erred in not fully instructing on all the law of the case" is too general and indefinite. [State v. Klegman (Mo.), 1 S. W. (2d) 833; State v. Silvey (Mo.), 296 S. W. 128, 130 (1-5). See also cases cited in note to Sec. 3735, Mo. Stat. Ann., supra.]

■ The last-mentioned assignment, No. 13, may have reference to the two which follow it, viz., (14), that the court erred in not giving an instruction on insanity and, (15), in "not giving an instruction as to self defense." Defendant presented no instructions on those subjects but orally requested the court to instruct thereon. which the court declined to do. In this there was no error. There was no evidence calling for submission of either of those questions. There was not a whisper of evidence of insanity, nor any tending to show self-defense unless it be found in defendant's statement in the above-copied portion of his confession to the effect that when he had forced Sandford to walk off the road into a field, after compelling him to take off his coat and vest, and ordered him to take off his tie "as I was going to use it to tie him up" Sandford "pulled his hand out of his pants pocket and pulled out it looked . . . to be a re-

volver.'' That raised no issue of self-defense. Defendant, according to his confession, shot Sandford in an attempt to rob him, even in the very act of robbing him and in the accomplishment of that felonious purpose. If Sandford attempted to resist, as he had a right to do, such resistance could not justify defendant in killing him. We have not here a case where one who, having brought on a difficulty, has attempted in good faith to withdraw therefrom and, being hard pressed, has slain his adversary to protect himself. We need not consider issues that might arise in such situation because the evidence presents no such issue. Under all the evidence the homicide was committed in the perpetration of or attempt to perpetrate robbery and was therefore, under the statute, murder in the first degree. There was no self-defense in the case.

█ Error is assigned in the court's refusal to sustain defendant's motion for a mistrial because, it is alleged, counsel for the State, in his argument, improperly referred to defendant's failure to testify. The record does not bear out this claim. Counsel said in his argument, ''There is no question about the guilt of this man. He admits it.'' Defendant objected on the ground that such remark was a reference to his failure to take the stand. We think it cannot be so construed and could not have been so understood by the jury. The argument is set out in full in the bill of exceptions. We think it clear from the whole argument, as well as from the language objected to, that State's counsel, in using said language, was referring to defendant's confession, which was in evidence.

█ Another contention not borne out by the record is that the verdict was the result of inflamed passion caused by the press of Kansas City. There is no evidence in the record as to any inflammatory publications in the press. Allegations of that kind in a motion for new trial do not prove themselves.

█ Assignments 18, 19, 20 and 21, that the verdict ''is against the evidence,'' that it is ''against the weight of the evidence,'' that it is ''against the law and the evidence'' and that it is ''against the law in the case'' have repeatedly been ruled insufficient to call for review. Moreover from what we have said above it is clear that they are without merit.

█ The last assignment in the motion for new trial is that the court erred in not discharging the jury and declaring a mistrial when the State's counsel, in sight of the jury, took from a box under the table a shirt supposed to have been worn by deceased when shot and ''covered with blood, and walked to the counsel table, evidently trying to conceal the same, had it marked as an exhibit, and then withdrew it without offering it in evidence, all of which was done to inflame and prejudice the jury.''

The record shows that in the early morning of April 10th a deputy

constable, Mr. Ewing, received a call from the young men who had first discovered deceased's body and went at once to the place where the body lay. It had not been touched. Ewing, called as a witness by the State, was asked if he could identify the shirt that was on deceased's body, and said he could. The shirt was then produced, apparently from a box under the counsel table. Mr. Boyle, for the State, indicated that he proposed to offer it to show powder marks on the arm of the shirt. [There had been some oral evidence that there were such powder marks.] Defendant objected that the offer was made only for the purpose of "inflaming the jury" and asked for a declaration of mistrial. By MR. BOYLE: "We haven't shown it to the jury, and let the record show I showed it to Mr. Owens (defendant's counsel) first and he said nothing. I picked it up and walked over between the shirt and the jury. We offer it for the purpose of showing powder marks on the arm." The court indicated that it felt inclined to admit the exhibit, but would permit defendant's counsel to "take the shirt back in the court's chambers and examine it." Mr. Boyle indicated that because there was some blood on the shirt, he wanted to know the court's views and wanted the court to see it, before permitting the jury to see it. The jury was withdrawn and in the absence of the jury the shirt was identified as the one taken from deceased's body and it was shown that it had powder burns and a little blood on the right arm. Defendant insisted upon his objection and the State withdrew the offer and the shirt was not introduced in evidence nor exhibited to the jury. There was blood on parts of the shirt but it does not appear that the jury saw that or got more than a glimpse of the garment. It appears that Mr. Boyle was commendably exercising care to avoid letting the jury see the shirt, especially the bloody portion, until the propriety of its introduction in evidence should be determined by the court. There is no indication in the record of unfairness or impropriety in his conduct, and we can see nothing in this episode that could have inflamed the minds of the jurors or that tended to excite prejudice. There was no obviously needless flaunting of bloody garments, as has happened in some cases. The shirt was offered for the purpose of corroborating oral testimony as to powder burns and the blood not only was not emphasized but, so far as we can glean from the record, was not seen by the jury. That Sandford had on a shirt when killed and that very probably it had some blood upon it when his body was found are facts which the jury could not have helped but know from other undisputed evidence. No prejudicial error inheres in this episode.

We have carefully examined the voluminous record and find no prejudicial error therein. The information, verdict and judgment are in due form and sufficient. Defendant appears from the record to have had a fair trial. His guilt is beyond question. The penalty

assessed is severe, but the crime was grave and the penalty is within the authorization of the statute. The judgment of the circuit court must be and it is affirmed. *Westhues* and *Bohling, CC.,* concur.

Date of execution set for January 28, 1938.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION TO MODIFY OPINION.

PER CURIAM:—On motion of the Attorney General the opinion herein is modified in the manner and for the reasons stated in the *Per Curiam* in State of Missouri, respondent, v. John Brown, appellant, 341 Mo. 53, 112 S. W. (2d) 568. The judgment on the verdict herein convicting appellant of murder in the first degree and inflicting capital punishment is hereby affirmed; and the cause is remanded to the trial court with directions to have the appellant brought before it and to impose a sentence of death by lethal gas in accordance with the provisions of Laws 1937, pages 222, 223.