**STATE of Missouri, Respondent,**

v.

**Issac TOURVILLE, Appellant.**

No. 45168.

Supreme Court of Missouri.

Division No. 1.

Oct. 8, 1956.

Rehearing Denied Nov. 12, 1956.

1

No attorney for appellant.

John M. Dalton, Atty. Gen., Paul McGhee, Asst. Atty. Gen., for respondent.

VAN OSDOL, Commissioner.

Defendant, by information substituted for indictment, was charged with murder in the first degree, Section 559.010 RSMo 1949, V.A.M.S., and with convictions of prior felonies under the Habitual Criminal Act, Section 556.280 RSMo 1949, V.A.M.S. The jury found defendant guilty of murder in the second degree, Section 559.020 RSMo 1949, V.A.M.S., and of a prior conviction or convictions of felony, and assessed his punishment at imprisonment in the state penitentiary for life. Herein upon appeal, defendant has filed no brief such as would afford us assistance in the review of this case, and we shall look to defendant's motion for a new trial for assignments of contended errors.

There was evidence introduced by the State tending to show that one William Schaeffer, a retired salesman seventy-four years old, was employed as a nightwatchman at a lumberyard located at the northeast corner of the intersection of North Broadway and East Taylor Avenues in St. Louis. A small building fronting westwardly toward Broadway constituted the business office of the lumberyard, and a few feet in front of and west of the office were three gasoline pumps, one of which contained gasoline. The one pump was primarily used in servicing the motor equipment used in the lumberyard business; however, gasoline was sold upon occasion to the public. Schaeffer's duty, in addition to those of nightwatchman, was to sell gasoline or lumber to purchasers who occasionally came to the yard late in the evening. He went on duty at 7 o'clock in the evening of September 29, 1953. He was not provided with any weapon by his employers, and no weapon was kept in or about the premises.

At approximately 6 o'clock in the morning of September 30th, police came to the lumberyard in response to an emergency call. They found Schaeffer kneeling on the floor of the office with his arms resting on a chair. He had suffered a shotgun wound in the right side of the body near the hip. The wound was "about the size of half a dollar," and was fatal. Schaeffer died the next morning, October 1, 1953. No shotgun or other weapon was found in or about the premises, or on the person of Schaeffer.

A niece of defendant testified that she saw defendant near her home on Cass Avenue at about 7 o'clock in the morning of September 30th. Defendant told the witness that he "had seen a watchman get shot"; and that, if she heard anything of the kind "on the news, don't be alarmed." At the time of this conversation defendant was sitting in his automobile which was painted a light color, gray or blue. The witness went to work at 7:30 that morning, but when she returned home at 4:30 in the afternoon defendant had repainted his car a dark blue.

The State introduced two written statements made by defendant. In one, of January 15, 1954, defendant stated that "fairly early" in the morning of September 30th he came to the lumberyard and asked Schaeffer for some gasoline and oil. Defendant had been "looking around this area" trying to get hold of a few dollars. By this defendant meant he was looking for a place to burglarize. Schaeffer told

defendant there was no gasoline in the pump and no oil on hand. At the time, Schaeffer was sitting "in the back part" of the office. Defendant turned around and was walking out of the building when Schaeffer mumbled something—"I didn't understand what he said at the time and I turned around to see what he said and he made the (sodomitical) approach." Defendant said, "No"; cursed Schaeffer; and Schaeffer came toward defendant "with his hands out. * * * I was still inside the station; so he came toward me * * * so I didn't know what he was going to do, so if he grabbed me I have nothing to protect myself with so I looked around * * * to try to see if I could find something to protect myself with and I couldn't find anything and I looked over at the right hand side of the door and seen a shotgun." Defendant "grabbed the shotgun * * * trying to protect myself and I was going to grab the barrel part * * and I had my hand on it like that, so I started to draw back and when I did, I hit the door facing and the gun discharged." Schaeffer "was pretty close up on top me when the gun went off; another few minutes I imagine, he would have had his hands on me." When the gun went off "he (Schaeffer) was only a few inches from me." Schaeffer fell to the floor, and defendant ran out of the building. He put the shotgun in the front seat of his car, and after driving around for awhile threw the shotgun into the river.

In a letter written January 16, 1954, defendant told his mother, "I was the one who killed the watchman on North Broadway on September 30, 1953." The letter continued in detailing facts substantially the same as stated in defendant's written statement of January 15th.

May 27, 1954, defendant made another written statement in which he said that the shotgun was his own and was in his automobile when he went to the lumberyard. He went to the lumberyard to inquire for gas and oil. Schaeffer came out to defendant's car and made an immoral approach; seized the handle of the front door of defendant's car; "and I seen he was still coming and saw he was going to, to come further and I just grabbed my shotgun and backed him into the building. * * * My intentions were to take him back and try to tie him up and leave the place with him tied up." When Schaeffer was three or four feet inside the building "he made a lunge for me and when he did, I started to back right quick and the gun hit the door facing and discharged." Defendant further stated that he took the shotgun to his home; and that his father, two or three days later, took it to the father's house.

The shotgun was turned over to the police by defendant's father. The weapon was a single shot, single action, 20-gauge shotgun. Tests tended to demonstrate the shotgun was not defective. It would not discharge unless cocked and the trigger pulled.

The State also introduced evidence tending to show that Schaeffer was in good health, although "hard of hearing." He was married and lived in his home with his wife and children. One of his employers, who had known him well for ten or twelve years, testified that he believed Schaeffer was not "in any way sexually perverted."

■ Several of the assignments of error in defendant's motion for a new trial are insufficient to preserve anything for our review. These insufficient assignments include—"1. That the verdict and judgment in the case are against the weight of the evidence. 2. That the verdict and judgment in the case are against the greater weight of the evidence. 3. That the verdict and judgment in the case are against the concrete and substantial evidence. 4. That the verdict was the result of bias and prejudice on the part of the jury. * * * 7. That the court erred in overruling objections of defendant to testimony offered by the state and in admitting into

evidence, over the objections and exceptions of the defendant, irrelevant and immaterial evidence offered by the state." A motion for a new trial "must set forth in detail and with particularity * * * the specific grounds or causes therefor." Supreme Court Rule 27.20, 42 V.A.M.S. This requirement is mandatory. State v. Schramm, Mo.Sup., 275 S.W.2d 343; State v. Gaddy, Mo.Sup., 261 S.W.2d 65. Several of the assignments are of errors in instructing the jury. Defendant did not object to any of the given instructions when they were given. Assignments of error in instructing the jury do not present anything for review upon appeal where, as here, a defendant does not object to the instructions at the time they are given and read to the jury. Supreme Court Rules 28.01 and 3.21; State v. Lawson, Mo.Sup., 290 S.W.2d 84; State v. Rush, Mo.Sup., 286 S.W.2d 767, and cases therein cited.

■ The trial court submitted the issue of defendant's guilt of murder in the first degree, as charged; and also submitted the issues of murder in the second degree and manslaughter, and of self-defense and accident. Errors are assigned in submitting murder in the second degree, and in submitting self-defense. It is asserted that no evidence supported a finding that defendant discharged the fatal weapon intentionally; that the State's evidence showed the shooting was accidental; that the submission of the issue of self-defense contemplates the homicide was intentional; and that, therefore, the self-defense submission was prejudicially erroneous. But, as we see it, there was substantial evidence tending to support the conclusion that defendant intentionally discharged the shotgun, a deadly weapon, at or in a vital part of Schaeffer's body. It was the province of the jury to determine the weight and credibility of defendant's written statements. The jurors could believe, or disbelieve and reject those parts of defendant's statements which tended to exculpate him, including the parts stating that the shotgun was discharged accidentally, just

as the jury was privileged to believe or disbelieve any or all parts of the statements, having considered the statements and the probability of the truth or falsity of the statements, or parts thereof, together with the other facts and circumstances shown in evidence. Having this province and these privileges of the jury in mind, the trial court was justified under the evidence in submitting the issues of murder in the second degree, and of self-defense (and of accident). The evidence tending to show that Schaeffer suffered a fatal shotgun wound when he was not in the possession of any firearm was substantial in tending to show that he met death through the criminal agency of another. Defendant's statement that the weapon was discharged while in his hands and the evidence tending to show that the weapon would not discharge except when cocked and the trigger pulled were substantial in supporting a conclusion that defendant discharged the fatal weapon intentionally. The evidence was substantial in tending to show that defendant intentionally shot and killed Schaeffer with a deadly weapon, and was sufficient in supporting the submission and finding of murder in the second degree. State v. Finn, Mo.Sup., 243 S.W.2d 67; State v. Hogan, 352 Mo. 379, 177 S.W.2d 465, and cases therein cited; State v. Reagan, Mo.Sup., 108 S.W.2d 391.

■ Error was assigned in unduly limiting the scope of defendant's inquiry upon the issue of the "voluntariness" of the written statement or confession of January 15, 1954. Our examination of the record has disclosed that, upon preliminary or voir dire inquiry on the issue of the voluntary character of the statement, defendant testified of the circumstances of the making of the statement, of the questions asked by the officers, and of his treatment by the officers from the time he was transferred (some time in November, 1953) from the jail in St. Louis County to the jail in the City of St. Louis and until the written statement was signed by defendant as stated, January 15, 1954. During his testimony defendant

alluded to conduct of officers the day he was brought to St. Louis. Upon objection by the State, the trial court excluded further inquiry into events occurring before defendant was transferred to the City jail. From the record we cannot determine whether the trial court's action was prejudicially erroneous. No offer of proof was made of the evidence which defendant expected to develop by further inquiry. The assignment is disregarded for that reason, if for no other. State v. Blakely, Mo.Sup., 24 S.W.2d 1020; State v. Barbata, 336 Mo. 362, 80 S.W.2d 865; State v. Dill, Mo.Sup., 282 S.W.2d 456.

■ The State produced an expert witness who stated he had received articles of clothing, including trousers, when he had inquired at the hospital for the clothing worn by William Schaeffer when he was shot. The trousers were marked as an exhibit, and counsel for the State asked a question concerning the tests the expert had made with respect to the trousers. Defendant's counsel objected to the question on the ground that no proper foundation "has been laid to show that these trousers are connected in any way with the victim." Although the trial court was inclined to overrule the objection, counsel for the State thought the objection well taken, withdrew the offer and did not further pursue the inquiry. Defendant's motion for a mistrial was overruled, and the jury instructed to disregard "any questions asked of this witness pertaining to these trousers." Defendant assigns errors in overruling the motion for a mistrial and asserts that this occurrence was highly improper and unjustifiably biased and prejudiced the jury against defendant. There is nothing in the record indicating that the exhibit was offered in bad faith or that the exhibit was in such a condition that it would tend to inflame the minds of the jury or that the exhibit was flaunted within the view of the jury. We cannot see that the trial court erred or abused its discretion in ruling, or gauging the effect of the occurrence. We rule the contention adversely to defendant. State v. Boyer, 342 Mo. 64, 112 S.W.2d 575.

■ During the early progress of the trial, counsel for the State saw that defendant was displaying a rosary, and, without the presence of the jury, the circumstance was called to the attention of the trial court. The trial judge directed defendant's counsel to tell defendant to put the rosary in his pocket. Later in the trial, State's counsel, in the presence of the jury, suggested that defendant "put his rosary away—Certainly we think he should have the comfort of praying, but this obviously is a show for the jury." Defendant's counsel objected. The trial judge said, "I ruled this morning that he should put the rosary away." Defendant's counsel replied, "I told him to do so, and he did, Your Honor." The judge then said, "No, he had it in his hand just now." Defendant's counsel then objected to "counsel's remarks about the matter," and the trial court ruled, "All right, proceed, Gentlemen. I will overrule the objection." We cannot say that defendant in again displaying the rosary after the trial court had directed him through his counsel to put the rosary away was not again displaying the rosary as a "show for the jury"; and the trial judge was in a position to correctly analyze this trial incident. Moreover, there was no objection to the trial court's direction that defendant put the rosary away, and no ground stated for the objection to the remarks of State's counsel "about the matter."

■ Two of defendant's assignments of error relate to the admission of exhibits purporting to show patterns of shot as made by discharges of the shotgun from various distances. The shot patterns were the results of tests made by an expert in discharging the weapon at and against pieces of cloth backed by "celotex" boards. One discharge was made with the muzzle of the weapon against the cloth; one with the muzzle an inch from the cloth; and the third with the muzzle twelve inches from the cloth. We have hereinbefore noted that the State had intended to introduce the trousers worn by deceased when he was shot. Apparently it had been the in-

tention of the State to introduce the trousers and the shot patterns into evidence so as to compare the size of a hole in the garment with the patterns of shot as shown on the exhibits. But, as stated, the offer of the trousers was withdrawn. Nevertheless, we have also noted defendant's statement that the weapon was discharged when Schaeffer was "very close," only "a few inches" from defendant. We believe it should not be said, from the record before us, that the exhibits were immaterial and prejudicial and of no aid to the jury in weighing and evaluating defendant's statements and in determining the facts and circumstances of the alleged homicide. These contentions are ruled adversely to defendant.

■ The niece of defendant testified that she had talked with defendant's "girl friend" after defendant was arrested. An officer testified that he had talked to defendant's girl friend and with defendant's niece after he was assigned to the investigation of the case. The officer also testified that defendant's girl friend was, at the time of the trial, confined at Chillicothe. The trial court overruled defendant's objection to this testimony, and overruled defendant's motion for a mistrial. The objection and motion were made on "the ground it has a tendency to prejudice the defendant on something that is not an issue in the case." Later in the trial defendant renewed the objection and motion on the ground that, because of evidence that defendant's girl friend was confined at Chillicothe, the jury could infer that defendant had been "associated with criminals and has been connected with them." The trial judge remarked that the only thing that could be prejudicial would be the fact that "she is now confined in Chillicothe." Counsel for defendant said, "That is the point of it * * *." Whereupon the trial court instructed the jury "to disregard the testimony that she (defendant's girl friend) is now confined at Chillicothe"; but defendant's motion for a mistrial was overruled. We have the

opinion that the trial court in addressing itself to the specific point of defendant's objection and in instructing the jury to disregard the testimony relating to the girl's confinement at Chillicothe was sufficient in purging whatever prejudice inhered in the admission of this evidence. It is noticed there was no evidence that defendant's girl friend was in any way a participant in the homicide, and defendant in objecting was not contending, and there was nothing in the evidence indicating the testimony relating to conversations with his girl friend was such as to raise the plain inference that she had implicated him in the crime, as in the case of State v. Chernick, Mo.Sup., 278 S.W.2d 741.

■ The information was sufficient in charging defendant with murder in the first degree; and, as stated, the evidence was substantial in supporting the submission of murder in the second degree. The verdict was sufficiently responsive in finding defendant guilty of murder in the second degree and in finding the fact of his prior conviction of a felony within the meaning of the Habitual Criminal Act, § 556.280, supra. We may not say the punishment assessed, which was that as prescribed by the Act, was excessive. § 556.-280(1), supra; §.559.030 RSMo 1949, V.A. M.S.; State v. McGee, Mo.Sup., 234 S.W. 2d 587; State v. Copeland, 335 Mo. 140, 71 S.W.2d 746, and cases therein cited. Defendant was granted allocution, and judgment and sentence were duly entered and pronounced.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.